## THE IMOAN.

## THE ALICE MORAN.

## FRANK JACOBUS TRANSP. CO. v. MORAN TOWING & TRANSPORTATION CO., Inc.

### No. 4.

Circuit Court of Appeals, Second Circuit.

Nov. 6, 1933.

Macklin, Brown, Lenahan & Speer, of New York City (Horace L. Cheyney, of New York City, of counsel), for appellant.

Purdy & Purdy, of New York City (Edmund F. Lamb, of New York City, of counsel), for appellee.

Before MANTON, L. HAND, and SWAN, Circuit Judges.

L. HAND, Circuit Judge.

At eight p. m. on March 17, 1928, the tug, "Alice Moran," took in tow five sand and gravel barges tandem at Port Jefferson, Long Island, bound for New York, the libellant's barge, "Imoan," being at the tail. When she got out of the harbor, she found a light wind, south-southeast to southeast; but about ten o'clock it changed to the east, and began to increase in force, until at midnight it had grown to a gale from the east-northeast. The barometer had been somewhat below normal and instable during the day, but was rising when the tug left port. At nine o'clock it began to drop, and during the early morning it became low again. The day had been cloudy, but there was no indication of any unusual weather. At two o'clock in the afternoon the tug had received on its radio set a weather broadcast as follows: "Moderate southerly wind, probably light rain, shifting to northwest on Sunday." At four in the afternoon of that day warnings had been received at the New York Weather Bureau of a northeasterly storm, increasing to gale force from the northeast or east during the night. Northeast storm warnings were not hoisted, however, till ten in the evening. The tug got no notice of the warning, though if it had, it would not have set out. As it steamed across Smithtown Bay from Port Jefferson to Eaton's Point, a promontory which makes out from the north shore of Long Island and forms the easterly side of Huntington Harbor, the weather became dangerous to the tow, which, on a course west three-quarters north, had the sea about three points on its starboard quarter. The master feared to go farther, and tried to make Huntington Harbor. After passing the buoy at Eaton's Point he starboarded his helm slightly, but after he began to feel the seas on his port quarter, concluded that the turn was dangerous, changed his mind, and went on for the next harbor, Cold Spring. To get into

Huntington Harbor he would have had to go about two miles before he got under the lee of Eaton's Point, during which the seas would have been more than four points on his port quarter. Lloyd Point is the western promontory of Huntington Bay; the tug's course towards it was west one-half south, and the seas were more nearly astern. When off the buoy outside it, again the master starboarded a little, but soon gave it up as unsafe; he was once more compelled to expose his port quarter to the seas at the same angle as in entering Huntington, though he had not so far to go to reach a lee. The wind had meanwhile risen, but a heavy rain set in for about ten minutes, which he thought would lower the sea, and which he assumed to be the precurser of the northwest wind which his radio notice had predicted. He resumed his course, this time west three-quarters south, still more astern, until he got off Matinicock Point, the entrance to Hempstead Harbor. It was necessary for him to make this harbor at any cost, for he was then in the lower end of the Sound which, below Execution Rock, he knew to be impossible for his tow in a sea such as had by that time risen. He therefore starboarded a third time, and while rounding into the harbor, four of the barges broke adrift, leaving him only the hawser boat. Owing to the rain, which had then set in, he did not at once discover how many barges he had lost, and continued in to the harbor, anchoring the hawser boat further inside than would otherwise have been necessary. Thereupon he went back and got a line to the second boat, which had broken from the last three, and which he selected because two bargees and the wife of one were on board. The third barge in sinking condition had been cut loose from the fourth and fifth, and to these he unsuccessfully tried to get a line, while he kept the second in tow. After he thought further efforts would be fruitless, he took the second barge into the harbor, and ordered the fourth and fifth barges to let go their anchors. These dragged while he was away, and when he got back both were ashore. It is for the damage to the "Imoan" that the suit was filed. The faults alleged and found by the court to be sustained were four: (1) In setting out at all; (2) in failing to put into Huntington Harbor as a port of refuge, or (3) into Cold Spring Harbor; (4) in failing to care for the barges after they broke adrift.

■ The evidence does not seem to us to support the first. When the tug left Port Jefferson there were no indications of dangerous weather known to her. It is true that, had

her master called up the New York Weather Bureau, he would have got advices which should have kept a careful navigator in port. We have at times held owners for failure to observe and be governed by storm signals in New York Harbor. Nicholson v. Erie R. R. (C. C. A.) 255 F. 54; McWilliams Bros. v. Davis (C. C. A.) 285 F. 312. But no storm signals were hoisted until the tug was two hours out, and they were fifty miles away, when they were. We should therefore be obliged to say that every master must call up the Weather Bureau for unpublished news, every time he leaves port, though the weather be good and such advices as he has are promising. We know of no authority for such a doctrine; it seems to us to demand an excessive caution. Even were it required, New York was not the nearest station; New Haven was closer, and surely would have been enough. But at New Haven he would not have got the report. It is true that one of the tug masters called at the trial said that he always did call up New York, and no doubt that is an added precaution, but no such general custom was shown, and in the absence of proof that it had become the practice of careful mariners, we think it was unnecessary. Just where the line should be drawn, it is impossible to say beyond our general sense of what is reasonable; we think that the suggested standard required more than prudence demanded.

■ A more troublesome question comes up as to failure to go into Huntington and Cold Spring Harbors. By the time the tug had reached Eaton's Point the weather had become dangerous; the wind was rising and the seas were getting too high for craft so loaded. This the master recognized, and decided to make for the nearest port of refuge; but when his tug began to feel the force of the sea on her port quarter, he changed his mind and stood for Cold Spring. There was reason to be fearful about getting in at Huntington. True, the sea had been three points on his starboard quarter while crossing Smithtown Bay, and there was a reach after he turned the buoy when it was dead astern. But he must starboard still further to get into the harbor, and this would put his port quarter four points to the wind, while he was steaming about two miles. The alternative he chose was Cold Spring and it had some advantages. The course to the buoy off Lloyd Point was a little more with the wind, and the turning buoy was closer to land. The entrance to the harbor was on a longer course before the wind, and though the second course would

have exposed his port quarter at about the same angle, he had an appreciably shorter run to reach a lee. Though the wind was rising, his advices promised a change to the northwest, which would make the Sound more comfortable as he approached New York. We cannot say that it was clearly bad seamanship to pass Huntington.

At Cold Spring substantially the same situation was repeated, except that the rain encouraged him to believe that the predictions were coming true. He tried here, and was once more frightened back upon his course, when he found how broad on his beam the seas must come to make the turn. His last chance was Hempstead, and it offered some advantages over either of the other two. The turning buoy is much closer to the shore, and the first reach to Week Point gave him a quartering sea on the port side of only about two points, not so much as on his course across Smithtown Bay, considerably less than if he had turned at Lloyd Point. To be sure the run to a lee was a little longer, but no one could say that the difference might not be worth having the sea more nearly astern.

Judging as we now can, it would probably have been better to take the chances of the turn into Huntington or Cold Spring, though even that is not certain. But we cannot charge a master because it seems to us, who were not there, that another choice would have been better. Only in case his conduct is outside the range of possible discretion, may we hold him for lack of seamanship; error to become fault must be gross and flagrant. The Eastern, 280 F. 711 (C. C. A. 2); The Edgar H. Vance, 284 F. 56, 59 (C. C. A. 9); The Lizzie D. Shaw, 47 F.(2d) 820 (C. C. A. 3). It seems to us that, if error there was, it was one which lay within the discretion of capable seamen.

The last fault charged and found is the failure to stand by and look after the barges when they broke adrift. We are not sure in just what this fault is thought to lie. The tug was not at once aware of what she had lost, and, so far as appears, could not have learned how many barges were gone, due to bad visibility. We are not satisfied that she should have anchored the hawser boat earlier; but, if she ought, there is no reason to suppose that she could have saved more than she did. After she picked up the second barge, she did her best to get a line on the fourth and fifth which were adrift. Manoeuvring at night in a storm with a scow in tow, is extremely difficult; we are certainly not disposed to charge

the tug, because she could not bring the second barge near enough to get a line on board the fourth and fifth barges. Nor is there any warrant for saying that she did not stand by, so long as she could help.

Decree reversed; libel dismissed.