AMERICAN BRIDGE DIVISION, UNIT-
ED STATES STEEL CORPORA-
TION, Libelant,

v.

ROEN STEAMSHIP COMPANY, a
corporation,

and

The Diesel TUG JOHN PURVES, her en-
gines, boilers, etc., Respondents.

No. 59–C–100.

United States District Court
E. D. Wisconsin.

April 29, 1963.

Robert G. McCreary, Jr., and David
G. Davies, Cleveland, Ohio, Arthur Wick-
ham, Milwaukee, Wis., for libelant.

Sparkman D. Foster, Detroit, Mich., John A. Kluwin and Bernard J. Hankin, Milwaukee, Wis., for respondents.

GRUBB, District Judge.

This is an action in admiralty in which libelant alleges that respondents' tug, John Purves, while towing libelant's barge A.B. No. 71 in Lake Erie, negligently caused the barge to capsize. As a result of the capsizing, certain equipment belonging to libelant which was loaded aboard the barge was lost. By stipulation, the issue of liability has been severed from the issue of damages. The testimony and evidence show the facts to be as follows:

In the late summer of 1957, construction of the Mackinac Bridge was being completed, and libelant, which had built the superstructure of the bridge, was in the process of moving its bridge construction equipment to other job sites.

Barges A.B. No. 71 and A.B. No. 72, owned by libelant, had been used during the bridge construction as derrick boats supporting a stiff-leg derrick and hoisting engines. Libelant decided to dismantle the derrick and to have the barges, with certain equipment aboard, towed from libelant's base at St. Ignace, Michigan, (near the job site) to Messena, New York.

Libelant's traffic manager, L. H. Tutwiler, made a number of inquiries of towing companies and railroads regarding rates to Messena and intermediate points, and received an oral quotation from John H. Purves, treasurer of respondent, Roen Steamship Company, for towage of the two barges and equipment thereon from St. Ignace, Michigan to Buffalo, New York. (Arrangements for the rest of the tow from Buffalo to Messena were made with other companies.)

On or about September 27, 1957, libelant received the following telegram:

"THIS WILL CONFIRM OUR TELEPHONE CONVERSATIONS WITH RESPECT TO TOWAGE OF YOUR TWO SCOWS FROM ST. IGNACE, MICHIGAN, TO THE AMERICAN SHIPBUILDING DOCK, BUFFALO, NEW YORK. DUE TO LATENESS OF SEASON WISH IT UNDERSTOOD THAT TOWING CHARGES OF $10,-000 IS CONSIDERED EARNED EVEN IF TOW OR PART OF TOW IS LOST. TOWING SERVICE IS SUBJECT TO ACTS OF GOD, PERILS OF THE SEA, DANGERS OF NAVIGATION OR OTHER CAUSES BEYOND OUR CONTROL. MAKE UP OF THE TOW AND TOWING ARRANGEMENTS TO BE APPROVED BY YOUR REPRESENTATIVE PRIOR TO DEPARTURE. EXPECT OUR TUG JOHN PURVES ARRIVE ST. IGNACE ABOUT TUESDAY NIGHT OCTOBER 1.

"ROEN STEAMSHIP COMPANY
"PURVES."

On October 2, 1957, L. H. Tutwiler sent the following letter to respondent company:

"This will confirm our telephone conversation on October 1 relative to your towing two American Bridge barges Nos. 71 and 72, together with tugboat, hoisting engines, stiff-leg derrick, wire rope, and miscellaneous structural steel and erecting equipment between St. Ignace, Michigan, and Buffalo, New York, for a total price of $10,000.00. We understand you will utilize dock facilities of American Shipbuilding Company in Buffalo as terminus.

"We understand one of the barges will have loaded on it the tugboat and hoisting engines, whereas the other barge will have loaded on it the stiff-leg derrick and miscellaneous structural steel. These are steel-deck barges measuring 100' by 26' by 6'6", weighing approximately 78 tons each, empty. Their light draft is 1'2". Details regarding how the equipment is loaded on these barges and the weight can be obtained from Mr. A. Drilling, phone St. Ignace, Michigan 860.

"Arrangements have been made with the Connors Standard Marine Corporation, 19 Rector Street, New York, New York, to tow these barges and equipment from Buffalo to Ogdensburg, New York. Your telegram advised that the tug 'John Purves' was expected to arrive at St. Ignace about Tuesday night, October 1, and that you estimated three to four days from St. Ignace to Buffalo.

"The United States Steel Corporation agrees that you will have earned towing charge of $10,000 even if tow or part of tow is lost. It is also agreed that towing service is subject to acts of God, perils of the sea, dangers of navigation, or other causes beyond your control. When you commence tow from St. Ignace, we will appreciate your advising this office of an E.T.A. at Buffalo so that we may coordinate pickup with Connors.

"If you have any further questions, please contact this office."

The derrick, which had been supported by the barges during the bridge construction, was dismantled, and the barges, which had been connected together by means of steel beams, were separated. Each of the two barges measured 100 feet in length, 26 feet in width, and 6 feet 6 inches in depth, and weighed approximately 78 tons. Their light draft was 1 foot 2 inches. Four manholes in the deck provided access to the interior of each barge which is divided by transverse watertight bulkheads into four compartments—two small "rake tanks" at the ends and two large compartments occupying the midships body of the barge.

The preparation and loading of the barges was under the overall direction of Robert C. Anderson, an assistant superintendent on the Mackinac Bridge job. Raymond E. Cote, the master mechanic, actually exercised the immediate supervision of the work. Cote pumped out 6 to 18 inches of water which had been placed into the barges for ballast when they were being used for a derrick platform. There were some minor cracks on the decks or sides of the barges which were welded. Anderson and Cote then checked the barges for leaks, but none were found.

The four manhole or hatch covers, which were about 18 inches across, were bolted down. The loading of the barges took two to three weeks to complete.

The load which was placed on barge A.B. No. 71 consisted of a 50 foot work tug, the Lewes, which was placed on deck in a welded steel cradle; two hoisting engines; eight drums of cable; two 10,000 pound and two 3,000 pound anchors; anchor chain; and miscellaneous cans, buoys, and dunnage. Anderson estimated the total weight of the load to be 138 to 146 tons, although in answer to interrogatories before trial, one of libelant's officials stated that the weight was approximately 129 tons. The second barge, A.B. No. 72, carried steel beams.

After the loading had been completed, Anderson and Cote again inspected the interior of the barges and found no cracks or evidence of leakage.

At some time between the completion of the loading and the departure of the barge on October 2, 1957, Captain Melvin J. Bishop, a fleet captain and marine surveyor, was requested to inspect the loaded barges. In his opinion the barges were properly loaded for the trip to Buffalo, New York, and could safely carry a load of 150 tons under the lake conditions in the fall of the year. In the course of his survey, he found 1 or 2 inches of water in the bottom of the barge, which was considered a typical amount for any working barge. He also measured the freeboard of the barges (the distance from the water's edge to the edge of the main deck) which he found to be 30 inches. There are other estimates of the freeboard made by various crew members of the Tug John Purves and by employees of libelant, ranging from 2 to 4 feet.

On October 2, 1957, the Tug John Purves arrived at St. Ignace, and at

12:20 P.M. on that day it departed with the barges in tow, A.B. No. 71 in the lead, on a towline of 800 to 1,000 feet. The barges were unmanned and in the exclusive control of the tug.

During the afternoon and night of October 2 and the morning of October 3, 1957, the flotilla made an uneventful passage down Lake Huron in clear weather with variable winds. Coming down Lake Huron, the tug was running at full speed, averaging over 11 miles per hour at 744 rpm. During this period the barges maintained an even trim and showed no list or instability.

At about 12:50 A.M. on October 4, 1957, as the flotilla had just gone through the Detroit River into the far westerly end of Lake Erie, the wind had increased to about 30 miles per hour from the northeast, so the flotilla sought shelter and anchored in Pigeon Bay at the northwest corner of Lake Erie. While there, the barges were again checked, and they appeared to be on an even trim and otherwise in normal condition.

At 6:00 A.M. on October 5th, the flotilla again got underway, but at 6:15 A.M. the tug checked her speed momentarily when she encountered a heavy swell. The barges apparently rode out the swell with no difficulty. At 7:22 A.M. the flotilla headed out toward the center of Lake Erie on an easterly course of 072° true, with a moderate north-northeasterly to easterly wind. The engines of the tug were running at 600 rpm throughout this period. At 12:10 P.M. the tug changed course to 090° true, or due east. At the time of this course change, the wind had again increased to 25 to 30 miles per hour and had shifted to due east so that the tug and her barges were proceeding head on into the wind and seas and at an average speed in excess of 8 miles per hour. At 2:00 P.M. the mate had observed the lead barge was "slightly down by the bow."

The captain of the John Purves, Captain Bernard Gjerde, ordered the barges to be pulled up close enough so that several men could go aboard the lead barge. The log indicates that they reported 6 inches of water "forward," i. e., in either the forward raked tank or the forward main tank. In any event, only one of the hatches was removed, and only one of the tanks was inspected.

At 2:45 P.M. the tug resumed speed at 600 rpm on the same course into the head seas built up by the 25 to 30 miles per hour easterly winds. The evidence established, and the court so finds, that the waves at that time were at least 4 feet high. Captain Gjerde then went below for a nap, leaving the mate with instructions to report any change in the way the barge was riding.

During the afternoon, the wheelsman recalled that the lead barge was "getting loggier * * *. * * * She seemed to be getting lower every time I looked. * * * You could tell it wasn't normal. It was below normal and she was taking spray fairly heavy aboard."

At 3:25 P.M., the speed was reduced from 600 to 550 rpm. No report was made to the captain. When he returned to the pilothouse at 5:30 P.M. and observed that the barge was further down by the head, Captain Gjerde immediately decided to go into Ashtabula, Ohio, which was then about 7 miles to the south. He ordered the course changed from 90° to 125° true. According to the mate on watch, at 5:30 P.M. the tug began to change course in gradual increments toward the new heading, but the speed was not reduced during the turn.

After the tug steadied on the new course of 125°, the lead barge, A.B. No. 71, listed to port, came back to starboard, and then continued to list to starboard until she suddenly turned completely upside down. A member of the crew observed that the barge " * * * went right over so fast that actually there wasn't much seeing to it, just the water and the spray when it tipped over and it was upside down." The capsizing occurred at 5:38 P.M. at a point which was about 33½ miles from the point where the lead barge was examined earlier in the afternoon, indicating an average speed that afternoon of about 9 miles per hour.

The tow continued to Ashtabula, barge A.B. No. 71 being upside down. The barge was righted in the harbor of Ashtabula by representatives and employees of libelant. The hoisting engines and miscellaneous equipment had been lost from the barge, although the tug Lewes was still securely fastened to her cradle on deck. A large amount of water was pumped out of the barge, after which all the compartments were examined, and no cracks or leakage was found.

The question of liability arising from the capsizing of the barge and the consequent loss of libelant's equipment must necessarily be based upon physical facts as adduced by the testimony and evidence and by the application of admiralty principles of law thereto.

It was clearly established by the testimony of libelant's expert witnesses, Raymond A. Yagle, professor of naval architecture, and Captain Harvey V. Johnston, a licensed master and marine surveyor, that the cause of the capsizing of barge A.B. No. 71 was the accumulation of a substantial amount of water in her tanks or compartments. The presence of this water impaired the stability of the barge. As Professor Yagle pointed out, free water within a vessel has the tendency to seek the low side of a vessel and thereby to shift the net center of gravity. This shift of the center of gravity in turn reduces or completely eliminates the righting moment which normally tends to bring the vessel back to an upright position. The turning of the tug was so closely connected in time to the capsizing that it must be considered the action which triggered the capsizing. With the tug changing course at 8 to 9 miles per hour, even as little as 6 inches of water in the forward tanks would be sufficient to destroy the righting moment of the barge.

During the turn to starboard, the water would concentrate on the port side as a result of centrifugal force pushing outward from the center. As the barge started to straighten her course—the centrifugal force therefore fading away —the water concentrated against the port side would tend to "overshoot" and surge against the starboard side. This piling up would so shift the center of gravity to starboard that the moment tending to right the barge would be destroyed. Thus, instead of rolling back from starboard to upright position, the barge continued rolling to starboard and overturned. In other words, with the righting moment destroyed by the violent shifting of water, the barge could only go to the next equilibrium position which is to turn through an angle of 180° and capsize.

It would be merely speculative to say just where and when the water found its way into the lead barge. Respondents contend that there was sufficient water in the barge even before she departed from St. Ignace to cause her to roll and capsize when she was exposed to a quartering sea as the tug changed course at 5:30 P.M. This argument is based upon a mathematical hypothesis explained by Professor Yagle. According to his calculations, if the weight of the empty barge were 78 tons, the load were 129 tons, and the freeboard as measured by Captain Bishop prior to departure were 30 inches, there must have been 40 to 50 tons of water, or almost 8 inches, in every compartment to account for the draft of 4 feet. (Since the depth of the barge was 6 feet 6 inches, if she had a freeboard of 30 inches, then she necessarily had a draft of 4 feet.)

The difficulty with respondents' approach is not with the calculations themselves but with the measurements upon which they are based. The weight of the load, for example, was stated to be approximately 129 tons in answer to an interrogatory prior to trial. Upon the trial, an estimate of 138 to 146 tons was made. It is clear that any figure given could be only a very rough estimate since none of the pieces of equipment was actually weighed. Moreover, the mathematical hypothesis that there was a substantial amount of water in the barge prior to departure cannot be accepted when all the persons who examined, maintained, or loaded the barges testi-

fied that the barge was pumped out; that no water or very little water remained in her compartments; and that only minor cracks had been found in barge A.B. No. 71 and that these were repaired. With this state of the record, the court finds that the barge began to ship water sometime during the voyage.

There is no evidence that the barge was not structurally sound and seaworthy prior to departure from St. Ignace. At 6:00 A.M. on October 5, 1957, when the flotilla got underway from its anchorage at Pigeon Bay, barge A.B. No. 71 had already progressed nearly 400 miles from St. Ignace without any sign of leaking, change of trim or list, or instability whatever. It was only after the John Purves had proceeded at an average speed of over 8 miles per hour into head seas in Lake Erie, with waves running approximately 4 feet high, that the barge began to go down at the bow. Captain Johnston testified that the barge "would be taking a lot of punishment" because the tug was proceeding into the head seas at too great a speed under the existing sea conditions that afternoon. It was his opinion that the water discovered in the barge shortly after 2:00 P.M. was " * * * due to the pounding into those head seas, either from the water going over the decks and finding a place there to run into, or through the hull from being pounded into the seas * *."

Although various members of the crew testified as to only spray going over the decks of the barges, it must be concluded that with a 4 foot sea, and a freeboard of less than 3 feet, a considerable amount of solid water went over the decks and found its way into the tanks through or around the manhole covers. Although the tug's log indicates that 6 inches of water was found in the barge "forward," it does not specify which of the forward tanks was checked. In any event, both Captain Johnston and Professor Yagle testified that only 6 inches of water in the forward rake tank could not possibly account for the fact that the front end of the barge was perceptibly down in the water when viewed from a distance of 1,000 feet. There must necessarily have been water in the forward main tank, if not in the other tanks as well.

Libelant charges respondents with negligence by reason of the fact that those in charge of the Tug John Purves failed to take any precautions whatever to protect the barge upon discovering that she was down by the head and had begun to take on water. Specifically, libelant claims, and the evidence establishes, that those in charge of the Tug John Purves made no attempt to inspect the other tanks on the barge in order to determine the extent of leakage; that they resumed the tow at the same speed on the same course into the head seas or wind; that they made no effort to pump out the tanks; and that they did not make any effort to head for the nearest port of refuge, or at least to take a more southerly course which would have taken the flotilla closer to land.

With regard to the failure of the tug to pump the water out of the barge, the evidence establishes that there were no pumps available on either the tug or on the barges on this particular voyage. Libelant has cited decisions wherein the failure of a tug to properly utilize pumps was held to be causal negligence. These decisions do not support libelant's claim that tugs are obliged, absent special contract, to supply pumps. These cases merely describe the duty of a tug which has pumps available, by contract or by voluntary action, to use the pumps if the situation requires it.

There has been no evidence to establish that respondents had a duty, by contract or otherwise, to supply pumps for this voyage. Nevertheless, Captain Gjerde's knowledge that no pumps were available could only serve to increase the caution that good seamanship would require under the conditions existing at that time.

It appears from the evidence that from the time water was discovered in the forward tank until the barge capsized, the flotilla had traveled approximately 33½ miles on a course which took her 7 miles north of Ashtabula. Instead of heading

for the nearest shelter at Fairport Harbor, or at least changing course only 3° which would have brought it on a more direct line to the harbor at Ashtabula, the tug proceeded into a head sea at over 8 miles per hour. To prevent any further leakage in the barge, libelant's witness, Captain Johnston, stated that the speed should have been reduced to 4 or 5 miles per hour at the most.

 The law with respect to a contract of towage, such as we have here, is well settled. The mere fact that a tow receives injury does not render the tug liable. Negligence must be affirmatively shown, and the burden of proving negligence rests upon those seeking to establish liability therefor. The tug is not liable as an insurer or common carrier but owes to the tow the duty to exercise such reasonable care and maritime skill as prudent navigators employ in the performance of similar services. Stevens v. The White City, 285 U.S. 195, 52 S.Ct. 347, 76 L.Ed. 699 (1932); River Terminals Corporation v. Southwestern Sugar and Molasses Company, 274 F.2d 36 (5th Cir. 1960). Applying these standards to the actions of the Tug John Purves on the afternoon of October 5th, the court finds that the tug did not exercise such reasonable care and maritime skill as prudent navigators employ in the performance of similar services, as required by the Stevens case, supra.

Respondents maintain that discovery of 6 inches of water in one of the tanks was not at all dangerous or alarming, and that the barge was never known to be in a perilous condition prior to her capsizing at 5:38 P.M. This argument cannot be accepted in the face of testimony by the wheelsman that the barge "seemed to be getting lower every time I looked." The engineer's log shows that the engines were checked at 3:25 P.M., although no entry to that effect was shown in the pilothouse log. It is apparent that the captain's sudden decision to head for Ashtabula at 5:30 P.M. was due to his belated concern over the increasing instability of the barge.

In proceeding with the voyage at what must be considered an excessive speed under the circumstances, the Tug John Purves was guilty of an act of negligence similar to that found by the court in The Dutton No. 6, 9 F.Supp. 233 (E.D.N.Y. 1934), where the court, commenting on the excessive speed at which a leaking barge was towed, stated at page 238:

"The No. 7 with the No. 6 in tow continued on at a speed at 6 to 7 miles per hour, which would not have been dangerous speed unless the tow was listed sufficiently for water to find its way into the float through the hatches; but any appreciable speed was dangerous with a list of that character. Surely if the list was noticeable to Capt. Angell of the steamship Lexington, not less than ¼ of a mile off the Dutton No. 6, it should have been observed by a competent officer of the Dauntless No. 7, and the headway of the boats stopped and measures taken for the safety of the Dutton No. 6.

"Failure to timely observe the lighter and take means to correct the condition, instead of continuing ahead at a speed of 6 or 7 miles an hour, was an act of negligence and a fault on the part of the tug Dauntless No. 7."

The situation here is also similar to the facts in Mississippi Valley Barge Line Co. v. T. L. James & Co., 144 F. Supp. 662 (E.D.La.1956), aff'd 244 F.2d 263 (5th Cir. 1957), cert. denied 355 U.S. 871, 78 S.Ct. 121, 2 L.Ed.2d 76 (1957), where the tug was held liable for continuing ahead with a barge known to be leaking instead of pumping out the barge or attempting to reach the nearest land. In holding the tug solely at fault for the sinking of the barge and the loss of her cargo, the court stated 144 F.Supp. at pages 667–668:

"Irrespective of how or when the blister on the barge was ruptured, the fact remains that water in the hold, forward of the rupture in the blister, was discovered and pumped out the early morning of the day of

the loss. Thereafter, instead of standing by the barge and inspecting the hold at regular intervals, water was not again discovered in the hold until the barge itself was noticed by the captain from the wheelhouse to be down by the head. Inspection at this time revealed that water was then in the hold in such quantity that a decision was made immediately to beach the barge. In an attempt to beach the barge after topping it around, the barge dumped its cargo into the river and sank. Allowing the barge to become so full of water that it was down by the head and in danger of sinking, particularly after being put on notice that the barge was making a controllable amount of water, is negligence of the grossest kind. Curtis Bay Towing Co. of Virginia v. Southern Lighterage Corp., 4 Cir., 200 F.2d 33; F. E. Grauwiller Transp. Co. v. Exner Sand & Gravel Corp., 2 Cir., 162 F.2d 90; Henry Du Bois Sons Co. v. Pennsylvania R. Co., 2 Cir., 47 F.2d 172. It was the direct and proximate cause of the loss in suit."

In that case it was argued that the barge was unseaworthy at the commencement of the voyage so that the barge owner was at fault equally with the tug. The court rejected that contention, stating at page 668:

"* * * The fact, however, that the LaBelle, prior to her loss, was making a controllable amount of water which the carrier negligently failed to control makes the finding of seaworthiness at time of delivery to the carrier's custody unnecessary. Assuming unseaworthiness, the proximate cause of the loss was, not unseaworthiness, but negligent failure to control the water in the holds. * * *"

■ That statement is equally applicable here. Even if it were assumed that respondents' contention was correct; namely, that the barge A.B. No. 71 was unseaworthy by reason of water in the tanks or an overloaded and top-heavy

condition at the inception of the voyage, the sole proximate cause of the capsize was the tug's complete failure to take any precautions when the barge was known to be taking on water and gradually becoming lower at the bow. See also Curtis Bay Towing Co. of Virginia v. Southern Lighterage Corp., 200 F.2d 33 (4th Cir. 1952). The court finds that the capsizing was not due to any alleged unseaworthiness of the barge but to the failure of the captain to adapt his navigation to the danger presented.

In Chemical Transporter, Inc. v. M. Turecamo, Inc., 290 F.2d 496 (2d Cir. 1961), libelant's barge was unseaworthy because of a hole in one of its tanks. When the tank began to fill up with water through the hole and the stern was awash, the tug came alongside, shortened the hauser, and began to pull the barge at a right angle. The court accepted expert testimony that pulling the barge at 90° under those conditions caused her to capsize. In holding respondents' tug solely liable, the court stated at pages 497 and 498:

"It is indeed true that the barge was at fault as well as the tug, but the tug's fault occurred after the consequence of the barge's fault had become apparent. That is to say though we were to concede that the tug did not know of the existence of the hole at any time before the barge capsized, it had become altogether aware that for some reason the barge was in serious trouble and needed immediate attention. So far as concerned the tug's duty, it was of no importance what the cause of this was; she was bound to adapt her navigation to the emergency so presented to her, even though it was not of her own doing.

"* * * In at least four decisions we have passed upon carelessness of a tug that caused damage to another vessel, which was herself also guilty of an earlier fault, contributing to the result; and we have held that, if the fault of the earlier vessel was obvious to the tug in time

for the tug to accommodate her own navigation to the emergency, the tug alone was liable. * * * In The Cornelius Vanderbilt, 2 Cir., 120 F. 2d 766, we assimilated this situation to that of the 'last clear chance,' and, indeed, that is what it is. When the fault of the first vessel appears or should be evident to the second early enough for the second to escape injury to the first vessel and herself, she must do so, if no more is required than a change in the navigation of the second vessel which involves no further burden than inconvenience. We can see no reason why because the first vessel has imposed so trifling a burden upon the second, she should be punished by the loss of relief for the injuries which the second has caused her. * * *"

■ Respondents seek to avoid the impact of the last clear chance doctrine by arguing that libelant has not proved that any of the suggested precautions or courses of action would have saved the barge upon discovery of her plight during the afternoon of October 5th. Once the fault of the tug is established, however, the burden is upon the respondents to show that none of the courses of action—i. e., making a full inspection of the tanks, seeking refuge promptly, and reducing speed—would have succeeded in keeping the barge from capsizing. See Sternberg Dredging Co. v. Moran Towing & Transp. Co., 196 F.2d 1002 (2d Cir. 1952). Respondents have not met this burden, and it follows that their negligence was the sole proximate cause of the capsizing.

No admiralty decisions by the Court of Appeals for the Seventh Circuit have been cited or found in which the doctrine of last clear chance has either been applied or rejected. It is not necessary to rule on its applicability in this action because the court finds that the proximate cause of the barge's capsizing was the negligence of the respondents.

Respondents finally contend that they must be relieved of any liability because of the alleged "exculpatory clause" which is part of the towage agreement. The telegram sent by respondents to libelant stated:

"TOWING SERVICE IS SUBJECT TO ACTS OF GOD, PERILS OF THE SEA, DANGERS OF NAVIGATION OR OTHER CAUSES BEYOND OUR CONTROL."

■■ This language refers only to damage "beyond our control" and, therefore, cannot be construed as including causes "within" respondents' control, such as acts of negligence. Further, even if the language could be interpreted as excusing liability for acts of negligence, such a clause is invalid as against public policy under the decision in Bisso v. Inland Waterways Corporation, 349 U.S. 85, 75 S.Ct. 629, 99 L.Ed. 911 (1955), where it was held that a towboat owner may not validly contract against liability for his own negligent towage. The decisions in Southwestern Sugar & Molasses Co. v. River Terminals Corp., 360 U.S. 411, 79 S.Ct. 1210, 3 L.Ed.2d 1334 (1959), and Chile Steamship Co. v. The Tug Justine McAllister, 168 F. Supp. 700 (S.D.N.Y.1958), involve different considerations and should be limited to the facts and circumstances therein found.

In Southwestern Sugar & Molasses Co. v. River Terminals Corp., supra, the court modified the rule of the Bisso case only to the extent that an exculpatory clause may not be void on its face if it is incorporated in a tariff filed with, and subject to the control of the Interstate Commerce Commission. Under these circumstances, the court said, it may be that the rate specified in the tariff was computed with the understanding that the exculpatory clause would apply to relieve the towboat owner of insuring itself against liability. The validity of such a clause should then be left to the determination of the commission. The decision in the Southwestern Sugar case does not apply to the instant action where no tariff, subject to the Interstate Commerce Commission control, is involved. See Dixilyn Drilling Corporation v. Crescent Towing and Salvage Com-

pany, 372 U.S. 697, 83 S.Ct. 967, 10 L. Ed.2d 78, where the United States Supreme Court expressly adhered to the rule of the Bisso decision. The rule of the Bisso decision is applicable here. The exculpatory clause is invalid.

The foregoing embodies the court's findings of fact and conclusions of law in accordance with Rule 46½ of the Rules of Practice in Admiralty and Maritime Cases, 28 U.S.C.A.

Counsel for libelant is hereby directed to prepare an appropriate decree consistent with this decision, submitting it to counsel for respondents for approval as to form only.