VALENTINE WATERWAYS CORPO-
RATION, Libelant,

v.

The TUG CHOPTANK, her engines, ap-
parel, tackle, etc., in rem, and Allied
Towing Corporation, as Owner and Op-
erator, in personam, Respondents.

ALLIED TOWING CORPORATION,
Libelant,

v.

BARGE BA 2012, her tackle, apparel, etc.,
in rem, and Valentine Waterways Cor-
poration, Owner, in personam, Respond-
ents.

Nos. 8564, 8618.

United States District Court
E. D. Virginia,
Norfolk Division.

Nov. 4, 1966.

Seawell, McCoy, Winston & Dalton, Robert M. Hughes, III, and Richard I. Gulick, Norfolk, Va., for Valentine Waterways Corp. and Barge BA 2012.

Vandeventer, Black, Meredith & Martin, Morton H. Clark, Norfolk, Va., for Allied Towing Corporation and Tug Choptank.

## MEMORANDUM

WALTER E. HOFFMAN, Chief Judge.

These consolidated libels arise from an oral contract of towage entered into between Valentine Waterways Corporation and Allied Towing Corporation, by which Allied (hereafter referred to as respondent) agreed to tow Barge BA 2012 belonging to Valentine (hereafter referred to as libelant) coastwise from New Orleans to New York for an agreed consideration of $12,000.00. During this trip the Barge BA 2012 incurred considerable damage for which libelant seeks to hold respondent liable. The latter denies liability and claims both towing and salvage awards for its assistance to the barge after it was damaged. Since the parties agreed in the final pretrial order to refer the question of damages to a Master, the only issue before this Court is the question of liability.

Barge BA 2012 was approximately 250 feet long and 50 feet wide, with a ten foot side. According to the Coast Guard certificate her gross weight was approximately 1076 tons. She possessed an unusually long bow rake which extended some 58 feet from the tip of the bow of the vessel to the beginning of the original rake. Libelant's vice president and operations manager both testified that the BA 2012 was a typical "inland" or "river" boat. The purpose of the instant contract was to transfer the boat from the Mississippi River to the New York harbor.

Prior to entering the contract, libelant obtained on September 9, 1964, a temporary Coast Guard "Certificate of Inspection" pursuant to the provisions of Section 4421, Revised Statutes (46 U.S C. §

399). This certificate authorized the Barge BA 2012 to navigate "coastwise for one voyage, unmanned, without cargo, from Greenville, Mississippi, to New York, New York." The certificate also stated that it was to expire upon the barge's arrival in New York. No survey of the barge was made prior to its departure; nor were any other special preparations made, such as packing or reinforcing the bow. Libelant's operations manager, Mr. Bouchard, initially expressed the view that the barge should be ballasted, but it was thereafter agreed to leave this decision to the discretion of the tug master. The Coast Guard certificate made no reference to ballasting.

On September, 25, 1964, respondent's tug Choptank was dispatched to New Orleans to pick up the BA 2012 at the American Barge Lines Terminal. The Choptank's master, Willis Wyatt, made a visual inspection of the exterior of the barge, checked the manhole covers, and rigged running lights on the stern. The mate testified that they also made sure that there was no water inside, but a complete inspection of the interior was not made.

The tug master likewise noted the Coast Guard certificate in the barge's inspection folder.

After taking on fuel the Choptank departed New Orleans at 0115 hours on September 26 with the barge alongside. The tug log indicates that the South Pass sea buoy was reached at 1030, at which time the barge was put astern on a 900 foot hawser. At that time the wind was from the east south east at 18–20 knots and the tug master estimated the sea height to be about three feet. The tug initially set a course of about 160 degrees magnetic and was running at full throttle—about 700 RPM. This gave the tug and tow a speed of about 6 or 6½ knots over the ground. The master of the Choptank testified that the barge was riding nicely.

During the afternoon or evening of the 26th the captain elected to come left to a course of about 115 degrees magnetic so that the tug would be closer to shore "in case the weather got bad."

During the afternoon the weather remained about the same and the mate, who was on watch, testified that the barge was still riding well.

When the mate came on watch again at 2400 the master informed him that he had slowed from 700 to 550 RPM. The wind appeared to have moderated to an estimated 10–15 knots, but the swells had increased and were running from 3 to 6 feet. The mate stated that he kept an eye on the lights of the barge during the night watch and that he noted nothing about the barge which gave him any cause for concern.

At about 0600 the next morning the master relieved the mate. Dawn was breaking and the mate testified that he could just make out the bulk of the barge at the time. A few minutes later the deckhand advised him that he had just seen the starboard rake of the barge fall off. The mate returned to the bridge and either the mate or the captain made a U turn with the tug and went back to inspect the barge. They discovered that the starboard bow rake had "dropped down" and was "hanging in the water." The port side was still intact. The captain called the office via marine telephone and received instructions to return to New Orleans with the barge. He shifted the hawser to the after end of the barge and towed the BA 2012 back to New Orleans stern first, arriving at about 0230 on September 29th. During the return trip the starboard portion of the bow rake broke off and was lost; it previously having been "hanging on".

■ The general principles of law relating to towage contracts are well settled. The owner of the tow is responsible for its seaworthiness, and the owner of the tug for its safe navigation. Curtis Bay Towing Co. of Virginia v. Southern Lighterage Corp., 200 F.2d 33 (4th Cir. 1952). The tug is not liable as an insurer or a common carrier; its duty is to exercise such reasonable care and maritime skill as prudent navigators employ for the performance of similar serv-

ice. Stevens v. The White City, 285 U.S. 195, 52 S.Ct. 347, 76 L.Ed. 699 (1932). One who offers a vessel for towing holds her out to be sufficiently staunch and strong to withstand the ordinary perils to be encountered on the voyage, The Edmund L. Levy, 128 F. 683 (2d Cir. 1904), and the mere happening of an accident does not raise any presumption of fault or negligence on the part of the tug. Southgate v. Eastern Transp. Co., 21 F. 2d 47 (4th Cir. 1927).

Libelant quite properly concedes that in order to hold respondent liable it has the burden of proving negligence in the manner in which the barge was handled. Stevens v. The White City, supra. Libelant contends that respondent was negligent in one or more of the following respects: (1) failure to ballast the barge properly; (2) towing the barge at an excessive speed for existing conditions; (3) towing the barge directly into the seas, which increased the wave action on the bow; and (4) failure to follow a coastwise route so as to be closer to available ports of refuge. We will examine each of these contentions separately.

### (1) *Ballasting.*

The testimony is undisputed that the decision as to whether or not to ballast the BA 2012 was to be left to the tug master's discretion, and it is also undisputed that he elected not to ballast the BA 2012 prior to the voyage. The only question is whether this failure to ballast constituted negligence on the part of respondent.

Libelant's expert witness, Frank Riess, was of the opinion that ballasting could have been done safely and that it would have steadied the barge in the seaway and eliminated the possibility of the welds breaking loose from the frames. On the other hand, several competent witnesses for respondent were of the opinion that ballasting was unnecessary and could cause trouble on an unmanned voyage. The Coast Guard certificate made no reference as to ballasting.

One thing is clear—there was a substantial difference of opinion as to whether ballasting would have been beneficial or detrimental. Under these circumstances, we do not believe that the tug captain clearly abused his discretion by electing not to ballast the BA 2012. As Judge Learned Hand stated in The Imoan, 67 F.2d 603, 605 (2d Cir. 1933),

> "Only in case his [the tug captain's] conduct is outside the range of possible discretion, may we hold him for lack of seamanship; error to become fault must be gross and flagrant."

We are not convinced that the tug master was clearly at fault for deciding not to ballast. It appears to be purely a matter of conjecture as to whether ballasting would have improved the barge's seaworthiness or not.

### (2) *Speed.*

The evidence indicates that the Choptank and the BA 2012 averaged six to six and one-half knots from the time they left the sea buoy at 1030 on the 26th until midnight that night. At midnight the captain slowed from 700 to 550 RPM's. Thereafter, based on the positions recorded in the Choptank's log, the tug and barge made good a speed of approximately 4½ knots from midnight until 0600 when the bow dropped. The tug master testified that he slowed down at midnight because the ground swell appeared to be increasing and because at night it was impossible to tell how the sea was hitting the bow. He also testified that his normal towing speed for a loaded barge was 5 or 6 knots and for a light barge, 8 or 9 knots.

We do not believe that the tug captain was guilty of excessive speed under the circumstances. One of libelant's own witnesses, a well-qualified tug master who had made 50 or 60 trips in the Gulf of Mexico, conceded that "four to four and one-half miles an hour isn't hardly any speed at all" under the sea conditions existing at that time. Taking judicial notice of the fact that 4½ knots is slightly faster than 4½ miles per hour, the Court is still of the opinion that the Choptank's speed was reasonable.

(3) *Course.*

The testimony indicates that the Choptank and the BA 2012 were headed directly into the swells when the master was relieved of the watch at midnight. Libelant urges that this direct impact of the swells on the barge increased the stress on the barge's bow and that the tug should have selected a course across the swells which would have reduced the impact.

Assuming that the barge had come left so as to be on a more easterly course, nevertheless, the barge would have taken waves on the starboard bow, which was the portion of the BA 2012 that gave way. Respondent could not have feasibly accomplished its mission without encountering some wave action on the bow.

■ Of course, if the tug had had some notice that the barge was in trouble and failed to take any remedial action, then the tug would have been guilty of negligence. Curtis Bay Towing Co. of Virginia v. Southern Lighterage Corp., supra; American Bridge Division, U. S. Steel Corp. v. Roen Steamship Co., 216 F.Supp. 353 (E.D.Wis.1963). But in this case the evidence indicates that the barge was riding well at all times prior to the incident and the Choptank had no notice that the BA 2012 was experiencing any difficulty.

(4) *Ports of Refuge.*

Libelant's final charge of negligence is that the Choptank should have selected a course closer to shore so that a port of refuge would have been more readily available in the event of bad weather. We believe this contention is without merit.

■ At the time the Choptank departed New Orleans there was only a fresh breeze blowing, the seas were moderate, and there was no hint of impending bad weather. Although the seas picked up some during the night, the wind moderated and there was no indication of any appreciable change in the weather. Had there been evidence of a storm brewing, the Choptank might well have been negligent in failing to keep closer to shore, or even for venturing out at all. But under the actual existing weather conditions, we do not believe the Choptank was at fault in proceeding directly across the Gulf. Indeed, the facts in this case are closely similar to those in The Fred Smartley, Jr., 100 F.2d 971 (4th Cir. 1939) in which a tug master elected to leave Baltimore and proceed down the bay with winds of 18–20 knots blowing. In holding the tug master blameless for the ensuing damage to his tow, the court stated (100 F.2d 974):

> "The advisability of leaving port under the conditions that existed was left to the judgment of the master of the tug alone and that the decision made by him was within the range of discretion properly allowed to him cannot be successfully disputed."

Libelant's own expert tug master conceded that three to six foot swells in the Gulf of Mexico in the fall of the year were not at all unusual. As respondent so aptly observes in its brief,

> "It is quite evident that if Barge BA 2012 was not in condition to withstand seas of three to six feet on the bow, at a speed of four and one-half to six knots, that the tug Choptank would have had an exceedingly difficult, if not impossible, task of even getting the tow to New York."

■ We hold that libelant has failed to sustain its burden of proving that the damage to the Barge BA 2012 was caused by respondent's negligence.

■ Turning to the condition of the BA 2012 itself, we think the evidence sustains a finding that the damage was proximately caused by the barge's own unseaworthiness. There is, of course, a presumption that a tow is unseaworthy when she sinks under normal conditions, in the absence of proof of improper handling. Ohio River Co. v. M/V Irene Chotin, 238 F.Supp. 114 (E.D.La.1965); The Radnor, 21 F.2d 982 (D.Ind.1927); The Senator Rice, 15 F.2d 882 (E.D.N.Y. 1925), aff'd 15 F.2d 883 (2d Cir. 1926). Although the BA 2012 did not sink, we

think there is an equal presumption of unseaworthiness where the barge comes apart under normal conditions.

■■■ Libelant relies upon the Coast Guard certificate as furnishing prima facie evidence of the barge's seaworthiness. This same contention was made in the recent case of South, Inc. v. Moran Towing & Transp. Co., 252 F.Supp. 500 (S.D.N.Y.1965) and was rejected by the court. See also Frederick Snare Corp. v. Moran Towing & Transp. Co., 195 F. Supp. 639 (S.D.N.Y.1961). While the issuance of a certificate of inspection by the Coast Guard may be some evidence of seaworthiness, we do not think it goes so far as to rebut the presumption of unseaworthiness arising from the unexplained breaking up of the barge. The very fact that the Coast Guard authorized the barge for only one coastwise trip to New York, rather than for unrestricted ocean use, seems to indicate that the barge was not normally intended for such use. It is true that the temporary certificate referred to the BA 2012 as a "seagoing" barge, but this description appears to have been casually inserted in conformity with the language of 46 U.S.C. § 395, which requires the Coast Guard to inspect, at least once every two years, "every seagoing barge of one hundred gross tons or over, not carrying passengers * * *." It is significant, we think that the permanent certificate of inspection which was later issued classified the BA 2012 as a "Cargo Barge" rather than a seagoing barge, and authorized the barge to be navigated on "LAKES, BAYS AND SOUNDS; AND ONE VOYAGE COASTWISE FROM NEW ORLEANS, LOUISIANA TO NEW YORK, NEW YORK."

Libelant introduced the evidence of Mr. Frank Riess, vice president of the company which repaired the BA 2012 and a qualified expert in the fields of marine engineering and naval architecture. Mr. Riess was of the opinion that the structurals and plate thickness of the BA 2012 were adequate for a delivery voyage such as this, but not for cargo use in ocean service. He was further of the opinion that the damage was caused by the handling of the barge rather than by any design weakness. However, when pressed for more specific details as to the barge's design on cross-examination, Mr. Riess' answers seemed unsatisfactory. There was also testimony by respondents' witnesses, as well as by Mr. Riess, to the effect that the length/depth ratio of this particular barge was beyond the limits prescribed by the American Bureau of Shipping for ocean towing. Although both parties apparently agree that the ABS requirements for ocean service were not applicable to the BA 2012 in this instance, since she was not regularly used in ocean service, we think that this is additional evidence of the inadequacy of the barge for even a single ocean trip.

■■■ Manifestly, the Barge BA 2012 was not intended for ocean use and its unseaworthiness was the proximate cause of the damage rather than any negligence on the part of respondent. Libelant therefore must bear the loss.

■■■ Turning to respondent's claim for a towage and/or salvage award, it is clear that respondent is not entitled to salvage. Although a tug is not precluded from recovering salvage for rescuing its own tow merely because of the tug-tow relationship, two conditions must be met before the tug can receive a salvage award: *First:* the danger from which the tow is rescued must not have been caused by the fault of the tug. *Second:* the tug and her crew will be entitled to salvage only for extraordinary efforts. Gilmore & Black, Law of Admiralty 453 (1957). Respondent has met the first of these conditions, but not the second. The Choptank incurred no unusual risk in towing the BA 2012 back to New Orleans and did no more than she had a duty to do under the circumstances. Compare Puget Sound Tug & Barge Co. v. Waterman S.S. Corp., 98 F.Supp. 123 (N.D.Cal.1951), aff'd 199 F.2d 600 (9th Cir. 1952), cert. denied 345 U.S. 941, 73 S.Ct. 832, 97 L.Ed. 1367.

Respondent is, however, entitled to some compensation for the expense in-

curred in its attempted performance of the contract. Although the question as to the proper rule to be followed in determining damages was not briefed or argued by the parties, the Court is presently inclined to the view that libelant's duty to furnish a seaworthy barge constituted an implied condition of the contract of towage. The breach of this implied condition rendered performance of the contract by respondent impossible, and it had a right to treat the contract as rescinded and to recover the reasonable expenses incurred in the partial performance of the contract. 17 Am.Jur.2d "Contracts" §§ 504, 506–507, 519 (1964). However, respondent is probably not entitled to recover its anticipated profit on the towage contract, since there had been no wilful breach of the contract by libelant. Compare Sanders v. Meyerstein, 124 F.Supp. 77 (E.D.N.C.1954). Restitution and damages being alternative remedies, respondent can recover under only one theory, and we presently believe the former is appropriate in this instance. Restatement, Contracts § 381 (1932)

An interlocutory decree will be entered in favor of Allied Towing Corporation. In the event of the failure of the parties to agree upon damages within a reasonable period of time, the matter may be referred to a Master.