**Herman PRICE and Daniel Price,**
**Plaintiffs,**

v.

**The TUG CARVILLE, in rem, and Inland**
**Rivers Transportation Co., Her Owners,**
**and Allied Towing Corporation, her operators, in personam, Defendants.**

**Civ. A. No. 5801.**

United States District Court,
E. D. Virginia,
Norfolk Division.

Jan. 10, 1969.

Crenshaw, Ware & Johnson, Norfolk, Va., for plaintiffs.

Vandeventer, Black, Meredith & Martin, Norfolk, Va., for defendants.

## MEMORANDUM OPINION AND ORDER

### FINDINGS OF FACT

MacKENZIE, District Judge.

1. The CITY OF RICHMOND was built in 1913 for Chesapeake Bay traffic as a steam passenger vessel. She spent most of her long useful life plying between West Point, Virginia, on the York River, to Baltimore, Maryland.

2. The characteristics of the vessel of moment in this suit were:

(a) She was 261 feet long, had a beam of 53 feet, drew 14 feet, and was of 2013 gross tons.

(b) She was of sponson construction with her wooden superstructure overhanging outboard from the steel hull.

(c) The freeboard at the aft cargo ports on either side of the vessel was only 3½ feet under normal conditions and on the date of this ill-fated voyage, the freeboard had been further reduced.

(d) In October, 1964, her propulsion machinery, pumps and generators had been inoperable for several years, and three portable pumps and a portable generator were put aboard for this passage.

3. In December, 1963 Herman Price and Daniel Price purchased the vessel, CITY OF RICHMOND, from Tolchester Lines, Inc., at Baltimore, Maryland. The vessel was to be towed to St. Thomas, Virgin Islands, and there employed as a restaurant, hotel and nightclub.

4. For the tow to St. Thomas, the CITY OF RICHMOND had been converted to a barge and was so classified by the United States Coast Guard.

After extensive preparations, under the direction and supervision of the United States Salvage Association, were completed in Baltimore, Maryland, the CITY OF RICHMOND, under tow, arrived in Morehead City, North Carolina, on September 29, 1964.

5. The riding crew required by the Coast Guard for the tow was a minimum of four persons, three of whom were to be at least rated AB Seamen. In fact, the riding crew was seven, but only one was an AB Seaman and he was the only person aboard who had ever been to sea in anything but a passenger status before.

6. Owner Price claimed that the captain of the CARVILLE (the tug), before sailing, indicated he would swap two AB Seamen from the tug, but in this conflict of evidence, the tug captain is credited in his denial of this arrangement, aided by the fact that he had only one certificated AB Seaman in his own crew and thus could not have furnished two ABs for any purpose.

7. The CARVILLE, a diesel tug, was built in New Orleans in 1951, she was 81.7 feet long, had a beam of 25 feet, drew 10.9 feet, and was powered by an engine of 1000 HP.

8. The CITY OF RICHMOND, as a barge, was loaded with a large quantity of heavy equipment for use in converting the vessel to a floating restaurant. In addition, there was on board several motor vehicles, heavy equipment, hardware stores, etc., owned by the plaintiffs who were transporting the same to St. Thomas, Virgin Islands.

9. Preparations for the Atlantic Ocean tow were made at the direction of the United States Salvage Association, and included the removal of the propeller and sealing the shaft. The rudder was secured in a fore and aft fixed position. The cargo ports, three to each side, along the cargo deck of the CITY OF RICHMOND were closed and secured.

10. It was also a requirement that the vessel be ballasted with the stern slightly down to assist in the towing operation. Under the direction of United States Salvage, markings had been placed on the vessel, fore and aft, designating its sailing draft lines.

11. Communications between the CITY OF RICHMOND and its tug, established by the owners of the CITY OF RICHMOND, consisted of two walkie-talkie citizen band radios. The walkie-talkies were not designed for continuous use because of the drain on the batteries. Signals as to when to use the walkie-talkie sets were arranged between the CITY OF RICHMOND and the CARVILLE. For the CITY OF RICHMOND to reach the tug at night, it would flash lights from the forward bridge deck of the vessel towards the tug.

12. A conversation ensued between the CITY OF RICHMOND and the Tug CARVILLE, via the walkie-talkies, with no difficulty in communication, at 1800 hours on 4 October 1964 and at that time no deep concern was manifested. An inquiry from the tow as to how long the weather would remain rough was answered that a change for the better would shortly occur.

13. At or about 2330, 4 October 1964, it was discovered by the CITY OF RICHMOND that seas had caved in the lower half of the aft port cargo door allowing water to enter. At that time winds were estimated at 25 mph, and the seas were 6 feet high.

Upon the discovery that the aft port cargo door had been stove-in, signals were made to the CARVILLE at 0100 with no difficulty and the emergency was explained. The Mate of the CARVILLE, Jarvis, testified that as he received the message it was that a port-light or port hole had been stove-in and that repairs were being undertaken.

14. As to this message, Smokey Stover, the riding master of the CITY OF RICHMOND, testified that he asked that speed be reduced and that course be changed to ease the motion of that vessel pending repairs. He denied that this was done. Jarvis, mate on the CARVILLE, however, indicates that the speed, which had been earlier reduced to 650 rpms, was further reduced and the vessel hove to into the wind, all in accordance with the request from the CITY OF RICHMOND and in accord with good seamanship. The plaintiffs' witness, Mr. Quecedo, in a pretrial discovery deposition, testified that the course was changed when Stover requested it and that he specifically noticed it.

15. When efforts to repair the aft port cargo door aboard the CITY OF RICHMOND were unavailing, it is the contention of Stover, master of the CITY OF RICHMOND, that signals were constantly made with a flashlight in the direction of the CARVILLE trying to attract the tug's attention and to get them to answer on the walkie-talkie. Stover's testimony, however, is that he had turned this task over to Quecedo *whom he posted on the deck directly above the port cargo hatch upon which the repairs were being attempted* so that he could direct repairs and also be in touch with Quecedo. Any difficulty in reaching the CARVILLE with Quecedo's light signal is credited by the Court to the fact that Quecedo's position above the aft port cargo hatch put him on the port side approximately three-quarters of the length of the CITY OF RICHMOND from the bow and in a very obscured position insofar as signaling to the CARVILLE was concerned.

16. When it became too dangerous to keep the members of the riding crew in the area of the aft port cargo door, the entire crew moved forward and attempts were made further to attract the CARVILLE'S attention.

To do this the CITY OF RICHMOND'S bell was rung, a pistol fired, a shotgun was fired (all of which would be patently ineffective, and was), and finally a flare was lit to attract attention. Conditions were reported to the CARVILLE and the tug was requested to call the Coast Guard and to beach the vessel. From the evidence, the Court finds that this was approximately 0215, 5 October 1964. The tug reversed course to put the wind and sea on the starboard quarter of the tow and proceeded back towards Cape Fear River. The request from Stover that the RICHMOND be

beached could not be complied with as this would endanger both vessels, their draft being about the same. The Coast Guard at Charleston, South Carolina, was contacted at 0230, 5 October 1964, and the log entry aboard the CARVILLE that this was done at 0100, 5 October 1964, is obviously an error. Admittedly, Mate Jarvis reconstructed the events for log purposes and the entries were not made as then they occurred.

17. When the true nature of the emergency was fully explained in the 0400 message, 5 October 1964, that there was 5 feet of water in the hold, the course was then altered towards the nearest point, Georgetown, South Carolina.

18. The CITY OF RICHMOND, while still in tow, sank at 0530, 5 October 1964, at latitude 33 degrees 3 minutes north and longitude 78 degrees 57 minutes west in 42 feet of water, approximately 35 miles southeast of Georgetown, South Carolina.

19. In an effort to make the CITY OF RICHMOND water tight on its main cargo deck, insecure wooden covers had been placed over two elevator shafts which descended from the cargo deck to the lower holds. The covers were kept in place by 4 x 4s wedged to the overhead. The evidence was that these 4 x 4s and covers became dislodged by the washing of water and when being struck by equipment which became loose on the deck. Water thereafter coming into the aft cargo port ran across the deck and into the lower cargo holds down these uncovered elevator shafts. Thus, the wooden covers over the open space in the cargo deck became dislodged by the very water the covers were installed to protect against and in weather which did not appreciably exceed that which was expected. United Sates Salvage witnesses for the plaintiffs agreed that the tow could reasonably have expected winds to 20 mph and seas to 6 feet. The most creditable weather report was from Flying Pan Lightship, only a few miles away, which indicated the winds never exceeded 28 mph or the seas 8 feet during the period here concerned.

20. The inexperience of the riding crew was a major factor in this catastrophe. The lack of experience of the crew is plainly shown in their conduct in the darkness in the hours just prior to the sinking of the vessel. For instance, Quecedo (whose regular employment was as maître d' of the Occidental Restaurant in Washington), on the bridge of the CITY OF RICHMOND, which was tossing about on the end of a 1000 foot tow line to the CARVILLE, when unable to attract the attention of the CARVILLE from the CITY OF RICHMOND suggested that he get out his rifle and attempt to shoot out the running lights of the CARVILLE. The impossibility of such a task and its absolute inappropriateness is illustrative of the conditions of panic existing aboard the CITY OF RICHMOND in these early morning hours.

21. The inexperience of the crew is further illustrated by the fact that the master of the riding crew, Stover, about midnight on 4 October 1964, upon finding one of the trucks coming loose from its secured position on the cargo deck, chose to sit in the cab with his foot on the brake for ten minutes to keep the truck from moving rather than seeing to its permanent securing and attending to the more pressing matter of the cargo port.

22. The boarding up and securing of the hull openings and the stowage of cargo were improperly directed and supervised by the United States Salvage Association. As an example of this, motor vehicles and equipment being transported were not properly fastened to the cargo deck and came loose on the very first day of heavy weather after leaving Morehead City. The movement of the stored equipment contributed to the breaking down of the closures attempts over the elevator shaft openings. The instructions as to the securing of the elevator shafts to make them water tight were improper and the welding of plates over the openings should have been re-

quired in order to assure that the covers would not be knocked aside by water or moving objects.

23. Contributing also to the tragedy was the fact that this vessel built for Chesapeake Bay use and not designed for ocean traffic was at least four inches overloaded at the time of its departure from Baltimore. This assumes a much greater degree of importance in view of the very limited free board of only three feet at the aft cargo ports.

24. In summary, the Court finds that the CITY OF RICHMOND was unseaworthy on at least four counts, namely, (a) the preparations for sea in the sealing of the elevator shafts was improperly planned, supervised and executed, (b) the cargo was improperly stowed and secured and the supervision of such stowage and securing was improper, (c) the provisions for pumping in the location of pumps and the lack of installed suction pipes to the lower holds was improper, and (d) with the ballasting and heavy cargo the CITY OF RICHMOND was overloaded from 4 to 10 inches on a vessel of very limited freeboard.

25. The crew was incompetent, both in its failing to meet the requirements as to the number of rated AB Seamen aboard, and also in its failure to have been even cursorily instructed in the duties which would reasonably be expected to arise to a seaman as a matter of course. There were specifically no instructions to the men on board in how to use the pumps, or how or when to sound for water in the holds, and no instructions to inspect the interior of the ship and the stowed cargo for signs of shifting, nor any instructions in emergency procedures for damage control. The pumps themselves had never been tested on board the vessel. The weather encountered was not out of the ordinary for the area and the season of the year.

In addition, as evidence of crew incompetence, the riding master, in charge of the vessel, Olin Smokey Stover, had never been to sea before except as a passenger. His testimony at trial upon which the plaintiffs had to rely to make their case, was contradictory, confused, and as observed by the Court, was not afforded any considerable credence.

26. The action of the CARVILLE when she changed course and hove into the sea at the time of the 0100 message on 4 October 1964, to allow repairs and in reversing course towards the Cape Fear River, to put the wind on the starboard quarter at 0215, was appropriate seamanship under the circumstances and weather prevailing. The failure to drop the tow and attempt to come back alongside the RICHMOND in the darkness in 6–8 foot seas is a matter of judgment on the part of the mate, Jarvis, and cannot be indicted, particularly when he had no pump aboard the tug which could be of any service.

27. Likewise the decision against beaching the tow cannot be questioned, because there was no lee shore available and a run to the windward shore would endanger the tug, both tug and tow being of relatively equal draft. Furthermore, a course to the beach 30 miles distant would have put the then southwest seas and wind directly into the damaged port cargo hatch. For the same reason, any earlier westward course change towards Georgetown would have accentuated the danger on the port side.

## CONCLUSIONS OF LAW

1. As recently decided in this United States District Court in Valentine Waterways Corporation v. The Tug Chaptank, 260 F.Supp. 210, 212 (E.D.Va. 1966), affirmed 380 F.2d 381 (4th Cir. 1967):

"The owner of the tow is responsible for its seaworthiness, and the owner of the tug for its safe navigation. Curtis Bay Towing Co. of Virginia v. Southern Literage Corp., 200 F.2d 33 (4th Cir. 1952). The tug is not liable as an insurer or a common carrier; its duty is to exercise such reasonable care and maritime skill as prudent navigators employ for the performance of similar service. Stevens v. The White City, 285 U.S. 195, 52 S.Ct. 347, 76 L.Ed. 699 (1932)."

See also Frederick Snare Corp. v. Moran Towing Co., 195 F.Supp. 639 (S.D.N.Y.1961):

"One who offers a vessel for towing holds her out as 'sufficiently staunch and strong to withstand the ordinary perils to be encountered on the voyage. If she be unseaworthy by reason of weakness, decay or leaks and such defects are not obvious to the master of the tug he will be absolved from responsibility where such unseaworthiness causes the damage complained of.' The Edmund L. Levy, 2nd Cir., 1904, 128 F. 683, Southgate v. Eastern Transportation Co., 4 Cir., 1927, 21 F.2d 47 (citing other cases)."

In the case at bar the cause of this foundering was clearly the unseaworthiness of the CITY OF RICHMOND and the incompetence of her riding crew.

2. There has been no evidence sufficient to prove that the tug CARVILLE was negligent in its navigation and handling of its tow, the CITY OF RICHMOND.

"Only in case his (the tug captain's) conduct is outside the range of possible discretion, may we hold him for lack of seamanship; error to become fault must be gross and flagrant." The Imoan, 67 F.2d 603, 605 (2nd Cir. 1933).

And as stated in Southgate v. Eastern Transportation Co., 21 F.2d 47 (4th Cir. 1927):

"The happening of an accident to a tow does not of itself raise any presumption of negligence on the part of the tug; and the burden of proof is upon the party seeking to charge the tug with liability therefor. The towage contract required no more than that one who undertakes the service shall carry out his undertaking with the degree of caution and skill which prudent navigators usually employ in similar services. (21 F.2d, at page 49)."

3. The complaint is dismissed.