Laura GASPAR and Ken Nykiel,
Plaintiffs-Appellees,

v.

DOWELL DIVISION, DOW CHEMICAL
COMPANY and ABC Insurance
Company, Defendants-Appellants.

No. 83–3667.

United States Court of Appeals,
Fifth Circuit.

Jan. 17, 1985.

Lemle, Kelleher, Kohlmeyer & Matthews, Richard B. Foster, New Orleans, La., for defendants-appellants.

Conner & Martinez, Joseph P. Williams, Jr., Metairie, La., for plaintiffs-appellees.

Before GEE, POLITZ and HIGGIN-BOTHAM, Circuit Judges.

GEE, Circuit Judge:

Laura Gaspar and Ken Nykiel (the "plaintiffs") brought this action against Dowell Division, Dow Chemical Company (Dow) and its insurer ABC Insurance Company alleging that one of Dow's boats damaged a boat that the plaintiffs claim to own. After a bench trial the district court found for the plaintiffs and awarded them $18,000 in damages. We reverse.

## I.

This case arises out of a collision that allegedly occurred between a tug owned by Dow and a boat docked alongside the plaintiffs' shrimp boat, known as the MISS CONDUCT or the MARINA MAE.[1] In the fall of 1981 the MISS CONDUCT was continuously moored to a cement slab on the Doullute Canal at Empire, Louisiana. The M/V SAND BAY was moored alongside the MISS CONDUCT and the M/V CHERYL LEE was moored outboard of the M/V SAND BAY. Laura Gaspar's brother Michael was living aboard the MISS CONDUCT during this time.

The M/V CANDICE L was a 59-foot, 900-horsepower model bow tug operated by Dow. On December 9, 1981, she was in command of a licensed operator, Captain V.J. Copous, pushing a 135-foot work barge and returning to her Venice, Louisiana, base after completing a job on a drilling rig in Grand Bastion Bay. As the CANDICE L was transiting the Doullute Canal into the Mississippi River and approaching the Empire Locks, Captain Copous had to wait for a supply boat locking through in the other direction. Captain Copous stopped the barge on the right bank of the Doullute Canal, holding the bow of the barge against the bank. The CANDICE L was at least 200 feet away from the MISS CONDUCT and the other boats moored alongside the concrete dock.

After the supply boat had passed, Captain Copous "twin screwed" the barge out into the canal. This involved putting the starboard engine ahead and the port engine in reverse to pivot the barge sideways into the canal. The CANDICE L was not required to back up during this maneuver.

Once the CANDICE L had entered the Empire Locks, Michael Gaspar appeared on the lock wall and shouted at Captain Copous. Captain Copous invited Gaspar aboard. Gaspar said that he had been sleeping aboard the MISS CONDUCT when he was awakened by a bump, looked out of the cabin, and saw the CANDICE L in the locks. Gaspar accused Copous of backing into the CHERYL LEE. Although Copous did not believe he could have hit the CHERYL LEE, Copous sent his wheelman, Ted Terrebonne, back with Gaspar to investigate.

Gaspar took Terrebonne to the three boats tied up at the cement slab and told Terrebonne that the CANDICE L had struck the CHERYL LEE, the outside vessel. Terrebonne went aboard the CHERYL LEE but saw no evidence of a collision, and Gaspar pointed out no specific damage to the boat. Gaspar did not ask Terrebonne

---

1. Although the issue was not addressed at length at trial, there is apparently some dispute as to whether the plaintiffs actually own the MISS CONDUCT. The plaintiffs testified that Ken Nykiel purchased the MISS CONDUCT from Daniel Tharp in October 1981 for a Harley-Davidson motorcycle worth $5,000 and $15,000 cash, with Laura Gaspar furnishing the motorcycle (which belonged to her "old man" Bama) and $5,000 cash. The plaintiffs, however, produced no bill of sale for this transaction. The plaintiffs later prepared a handwritten docu-ment that indicated Laura Gaspar's half interest in the boat. This document bears a notarial seal dated November 10, 1981. Furthermore, although Laura Gaspar claimed to have borrowed some of the cash she used to purchase the MISS CONDUCT and to have taken the rest from her tattoo business, her 1981 federal income tax return shows net losses from her tattoo shops and insufficient income to account for the investment. Nykiel produced no financial records.

to inspect either the SAND BAY or the MISS CONDUCT.

After Terrebonne left and the CANDICE L resumed her journey, the MISS CONDUCT began to take on water. This activated the boat's automatic bilge pumps, but these pumps were unable to remove the water fast enough to prevent the boat from sinking. The MISS CONDUCT continued to take on water, sinking six days after the incident with the CANDICE L. Aside from borrowing a gasoline pump several days after the alleged collision to attempt to pump out the MISS CONDUCT, Gaspar did nothing to prevent the boat from sinking, nor did he or the plaintiffs attempt to raise the MISS CONDUCT for repairs. Aside from filing a Coast Guard report the day after the incident, neither Gaspar nor any plaintiff did anything about the sunken MISS CONDUCT until the plaintiffs filed this action in the district court thirteen months after the alleged collision occurred.

In their complaint the plaintiffs alleged that the CANDICE L had collided with the CHERYL LEE, causing the CHERYL LEE to strike the SAND BAY and the SAND BAY to strike the MISS CONDUCT. Dow maintained that no collision occurred. After a bench trial the district court found that the CANDICE L had collided with the CHERYL LEE and had caused the MISS CONDUCT to sink. The court awarded the plaintiffs $18,000 in damages despite uncontroverted expert testimony that the

MISS CONDUCT was worth only $2,500. This appeal followed.

## II.

▮ Dow contends that the district court erred in finding that the CANDICE L struck the CHERYL LEE and damaged the MISS CONDUCT. Under rule 52(a) of the Federal Rules of Civil Procedure, we may not set aside a district court's findings of fact unless the findings are "clearly erroneous." This rule applies to actions in admiralty in the same manner as it applies to other civil actions. *Guzman v. Pichirilo,* 369 U.S. 698, 702, 82 S.Ct. 1095, 1098, 8 L.Ed.2d 205, 209 (1962); *Union Oil Co. of California v. Tug MARY MALLOY,* 414 F.2d 669, 670 (5th Cir.1969).

▮ Applying the clearly erroneous standard and following rule 52(a)'s requirement of giving "due regard ... to the opportunity of the trial court to judge the credibility of the witnesses," we conclude that the district court erred in finding that the CANDICE L collided with the CHERYL LEE. All of the evidence presented at trial suggests that no collision occurred. The plaintiffs' only witness who was at the scene of the alleged collision, Michael Gaspar, testified that he did not see the CANDICE L strike the CHERYL LEE. Both Captain Copous and Ted Terrebonne of the CANDICE L testified that they did not believe their boat had struck or could have struck the CHERYL LEE.[2] Because the

2. In the following exchange at trial, Copous, under examination by the court, "admitted" that he was not absolutely certain at the time that the CANDICE L did not strike the CHERYL LEE:

Q. Okay. Captain Copous, I believe you testified in response to Mr. Foster's question that you did not hit any other boat, is that correct?
A. That's correct, sir.
Q. If that is the case why did you send your deckhand back with Mr. Gaspar to inspect—
A. That is normal procedure with my company and with myself. I always want to check things out. I could not leave, sir, without finding out something.

Q. So, in your own mind then you admitted the possibility anyway that the boat could have been struck, is that correct?
A. No, sir, not by me, sir.
Q. Not by you?
A. No, sir.
Q. And the only reason you had for sending the deckhand back to inspect the boats at that time is because it's company policy?
A. Not necessarily company policy. It's just a good seamanship to make sure that, you know, on my part and—that is the way I am, I just make sure that everything is in order and I don't—
Q. Well, if you were sure it was in order, sir, why did you send the deckhand back?
A. Because I wanted to make sure, I don't know, I do it all the time if I see some-

CANDICE L was engaged in the "twin screw" maneuver at the time the collision allegedly took place, the crew of the CANDICE L likely would have seen any collision occur. Also, under the section of the Coast Guard report titled "Recommendations for Corrective Safety Measures Pertinent to this Casualty," Gaspar wrote "inforce [sic] strict wake law." This suggests that Gaspar did not believe that a collision involving the CANDICE L was responsible for the damage to the MISS CONDUCT. Gaspar's speculative testimony regarding the collision is the only evidence presented at trial to support the court's conclusion that a collision occurred. We hold that this evidence is not sufficient to support a finding for the plaintiffs on this issue.

### III.

Dow also contends that the district court clearly erred in finding that the value of the MISS CONDUCT was $18,000. The plaintiffs testified at trial that Ken Nykiel purchased the MISS CONDUCT for a Harley-Davidson motorcycle worth $5,000 and $15,000 cash. The plaintiffs, however, produced no bill of sale reflecting this transaction. *See supra* note 1. Dow called Robert L. Stickney, an experienced marine surveyor, as an expert witness. Mr. Stickney testified that he had examined the MISS CONDUCT, that the boat was unsuitable for shrimping in Louisiana waters, and that the value of the MISS CONDUCT before she sank was approximately $2,500. Aside from their testimony regarding the MISS CONDUCT's purchase price, the plaintiffs produced no evidence suggesting that the MISS CONDUCT was worth more than $2,500. Nevertheless, the district court discredited the testimony of Dow's expert and found that the MISS CONDUCT's value was $18,000, stating that the motorcycle given in exchange for the boat was worth only $3,000.

 We agree with Dow that the district court erred in finding the MISS CONDUCT worth $18,000. The correct measure of damages in suits involving injuries to personal property is not the purchase price of the chattel, but the amount necessary to restore the damaged property to the same condition as existed immediately before the injury occurred. *City of New Orleans v. American Commercial Lines, Inc.*, 662 F.2d 1121, 1124 (5th Cir.1981). The plaintiffs presented no evidence regarding the value of the MISS CONDUCT immediately before the alleged collision. Although the district court as a finder of fact was free to discredit the testimony of Dow's expert, the plaintiffs' scant evidence

body in trouble I go help them, that is just the way I am, sir.

Q. But you sent the deckhand back you said to make sure that none of the vessels were struck, is that correct?

A. Yes, sir.

Q. So in your own mind you weren't sure that any of those vessels had been struck?

A. In my own mind, sir. I am sure I didn't hit it.

Q. I am talking about at the time of this incident.

A. Would you repeat that, sir.

Q. At the time of this incident when you sent the deckhand back to inspect these vessels you were not completely sure that these vessels had not been struck, is that correct?

A. Not by me, sir.

THE COURT: That is not the answer to the question.

THE WITNESS: I am sorry, sir. I didn't quite understand him.

THE COURT: I have to think that you understand the question. You sent the deckhand back to check it when the guy came up and complained?

THE WITNESS: Yes, sir.

THE COURT: So his question to you at that time since you sent the man back to check it you must have not been sure that it didn't strike it?

THE WITNESS: Okay, yes, sir, all right.

THE COURT: Were you sure at that time that your vessel did not strike?

THE WITNESS: No, sir, I am not sure.

First Supplemental Record on Appeal at 22–25. This exchange indicates that Copous satisfactorily answered the plaintiffs' attorney's question regarding Copous' state of mind at the time of the alleged collision. When the court told Copous that he had answered incorrectly, Copous apparently became confused and gave the court the answer he believed the court wanted. This "admission" certainly is not persuasive evidence that a collision occurred and does not support a finding for the plaintiffs on this issue.

did not provide the court with a sufficient basis to conclude that the MISS CONDUCT was worth $18,000 immediately before sinking.

### IV.

Even if the plaintiffs had presented sufficient evidence to support a verdict in their favor on the collision and valuation issues, the plaintiffs would not be entitled to their judgment because of their entire failure to mitigate damages. The law is well settled that a vessel owner has a duty to minimize damages to the vessel. *See, e.g., Southport Transit Co. v. Avondale Marine Ways*, 234 F.2d 947, 954 (5th Cir. 1956); *Todd Shipyards Corp. v. Turbine Service, Inc.*, 467 F.Supp. 1257, 1300 n. 26 (E.D.La.1978), *aff'd in part & rev'd in part*, 674 F.2d 401 (5th Cir.), *cert. denied*, 459 U.S. 1036, 103 S.Ct. 447, 74 L.Ed.2d 602 (1982); *In re Sincere Navigation Corp.*, 327 F.Supp. 1024, 1026 (E.D.La.1971). *See generally* Restatement (Second) of Torts § 918 (1977) ("One injured by the tort of another is not entitled to recover damages for any harm that he could have avoided by the use of reasonable effort or expenditure after the commission of the tort."). Here, aside from a single attempt to pump water out of the MISS CONDUCT, the plaintiffs made no attempt to keep the boat from sinking, even though the MISS CONDUCT remained afloat for six days after the alleged collision. After the boat sank, the plaintiffs simply allowed the MISS CONDUCT to remain on the bottom of the canal, refusing to pay the approximately $300 a shipyard across the canal would have charged to raise and repair the boat. Although the plaintiffs contend that they had insufficient funds to finance the repair of the MISS CONDUCT, Laura Gaspar's 1981 federal income tax return indicates that her tattoo business generated a cash flow that would have enabled her to make the repairs. We cannot permit the plaintiffs to recover for damage to the MISS CONDUCT that the plaintiffs could have avoided with a minimal expenditure of time and money.

For the foregoing reasons, the judgment of the district court is reversed and judgment is here rendered for the appellant.

REVERSED.