796 F.2d 776
 1987 A.M.C. 2956
 BOSNOR, S.A. DE C.V., et al., Plaintiffs-Appellees
Cross-Appellees Cross-Appellants,
v.
Tug L.A. BARRIOS, her engines, etc., et al., and Delmar
Systems, Inc., Defendants-Appellees and Cross-Appellees,
v.
WALTON & SONS STEVEDORING AND CONTRACTING CO., INC.,
Defendant-Appellant-Appellee Cross-Appellee, Cross-Appellant
and
SLATCO, INC., Defendant-Appellee Cross-Appellant Cross-Appellee,
v.
CHERAMIE BO-TRUC # 7, et al., Defendants-Appellees Cross-Appellees,
and
Reyna International, Inc., Defendant-Cross-Appellee Cross-Appellant,
and
World Marine Association, Inc., Northwest Insurance Co., and
Certain Underwriters at Lloyds of London,
Defendants-Cross-Appellees.
 No. 84-2212.
 United States Court of Appeals,
Fifth Circuit.
 Aug. 13, 1986.
 
 John F. Waldo, Michael A. Clann, Houston, Tex., for Slatco.
 Joseph Newton, Houston, Tex., for Bosnor.
 John K. Meyer, Houston, Tex., for World Marine.
 Michael L. McAlpine, New Orleans, La., for Tug L.A. Barrios & Slate.
 David C. Redford, Houston, Tex., for Reyna Intern.
 James R. Carter, William A. Porteous, III, New Orleans, La., Harold K. Watson, Houston, Tex., Laura Gibson, Houston, Tex., for Cheramie, et al.
 Gus A. Schill, Jr., David R. Walker, Houston, Tex., for Walton.
 James R. Carter, Harold K. Watson, Houston, Tex., William A. Porteous, III, New Orleans, La., for Cheramie, et al.
 Appeals from the United States District Court for the Southern District of Texas.
 Before CLARK, Chief Judge, and W. EUGENE DAVIS, Circuit Judge.*
 W. EUGENE DAVIS, Circuit Judge:
 
 
 1
 This case stems from the loss of a cargo of steel pipe, plate and beams in the Gulf of Mexico. Following a liability trial, judgment was entered in favor of the cargo owners against the stevedore that loaded the cargo aboard a barge, the tug that towed the barge, and the tug's owner. In a flurry of appeals and cross-appeals, almost all parties express some dissatisfaction with the judgment. After reviewing their claims, we affirm in part, reverse in part and remand the case to the district court.
 
 I. FACTS
 
 2
 The series of events which culminated in this suit began when Bosnor S.A. de C.V. (Bosnor) and Fabricaciones Ingeneria y Montejes, S.A. (FIMSA) arranged through Reyna International, Inc. (Reyna) to ship approximately 1800 tons of steel pipe, plate and beams from Houston, Texas, to Tampico, Mexico. Reyna, a Houston based freight forwarder, approached Delmar Systems, Inc. (Delmar) for a suitable barge and tug to transport the cargo. A few weeks earlier, Delmar had supplied Reyna with a tug, the L.A. BARRIOS, and a barge, the CHERAMIE BROS. 101, for an identical voyage in which approximately 1400 tons of similar cargo were safely shipped from Houston to Tampico. Believing them to be adequate to meet Reyna's current needs, Delmar bareboat chartered the CHERAMIE BROS. 101 from her owners, CHERAMIE BO-TRUC # 7, INC., et al., (Cheramie) and in turn sub-chartered it to Reyna. Delmar also time chartered the L.A. BARRIOS from its owner, Slatco, Inc., for use on this voyage; Slatco provided the tug's four man crew.
 
 
 3
 The CHERAMIE BROS. 101 is an unmanned 160-foot steel deck barge. According to her load line certificate, she can be loaded to a minimum freeboard of two feet four inches provided the cargo's vertical center of gravity does not exceed two feet seven inches above the main deck.
 
 
 4
 The L.A. BARRIOS, a 60-foot ocean tug with a 1200 horsepower capacity, was dispatched to deliver the CHERAMIE BROS. 101 to Walton & Sons Stevedoring & Contracting Co., Inc. (Walton) on Greens Bayou in Houston; Walton had been hired by Reyna to load the cargo onto the barge. On October 7, 1980, the L.A. BARRIOS delivered the CHERAMIE BROS. 101 to the mouth of Greens Bayou where a local shift tug took the barge to Walton's facility. On October 9, 10, and 11, Walton loaded the barge and secured the cargo. World Marine Association, Inc. (World Marine), a marine surveying company hired by Reyna, attended the loading and performed a loading and securing survey of the cargo.
 
 
 5
 To secure the cargo, Walton welded eleven vertical stanchions to the deck on each side of the barge. The stanchions, which were made from pipe, were twelve inches in diameter and extended ten feet above the deck. They were secured to the deck by triangular plates welded both to the barge's deck and the stanchions. The stanchions were not positioned on the deck above doubler plates or other reinforced bracing. Most of the cargo was steel pipe; the pipe was placed in three stacks, fore and aft, with the remaining cargo placed between the stacks of pipe. The stacks of pipe were secured by two inch steel bands which ran around the outside of the stanchions and over the top of the cargo. The bands were attached to the deck and the stanchions. Additionally, wooden dunnage was placed on the deck and between different tiers of the pipe.
 
 
 6
 After the cargo was completely loaded, the barge had a starboard list of ten to eighteen inches and its bow was trimmed. Additionally, the barge was almost down to its loadline and the cargo's center of gravity was more than five feet above the deck. World Marine advised Reyna that the trim and list were undesirable but did not recommend any corrective action before the commencement of the voyage. World Marine reported that the cargo was properly "loaded, stowed, and secured for the intended voyage."
 
 
 7
 On October 11, 1980, the loaded CHERAMIE BROS. 101 was delivered back to the L.A. BARRIOS at the mouth of Greens Bayou. Before proceeding to Tampico, the tug's captain pumped seawater into the barge as ballast. The tug and tow then headed out of Greens Bayou toward the Gulf of Mexico. While exiting Greens Bayou, the tug allowed the CHERAMIE BROS. 101 to collide with another barge. This collision caused several of the securing bands around the cargo to break and no attempt was made to replace them.
 
 
 8
 During the voyage, heavy weather, which was not unusual for the Gulf of Mexico in October, slowed the tug's progress. On the eighth day of the voyage with the seas finally calm, the stanchions on the starboard side of the barge failed and most of the cargo went overboard forty-five miles from Tampico in 140 feet of water. No attempt was made to salvage the cargo.
 
 
 9
 Bosnor and FIMSA brought this suit to recover the damages for their lost cargo. The district court attributed the loss concurrently to actions taken by Slatco, the L.A. BARRIOS, and Walton. Specifically, the court found Slatco at fault for negligently adding excessive ballast to the CHERAMIE BROS. 101, towing the CHERAMIE BROS. 101 with too short a tow line, and towing the barge in a manner which loosened the cargo. The court found that the L.A. BARRIOS negligently caused the CHERAMIE BROS. 101 to collide with another barge and break some of the securing bands holding the cargo. Walton was found at fault for adding stanchions to the barge insufficient to secure the cargo, inadequately securing the cargo, and loading the barge so that it was down by the head with a starboard list. The district court apportioned liability 60% to Walton, 25% to Slatco, and 15% to the L.A. BARRIOS in rem.
 
 
 10
 The district court concluded that the tug and barge were inadequate for the tow but would have been adequate if the cargo had been secured properly and excessive ballast not added; it therefore attributed no responsibility to Cheramie, Delmar or Reyna for the loss. Further, Slatco and Walton were ordered to pay Delmar's and Cheramie's costs and reasonable attorney's fees pursuant to Ryan Stevedoring Co. v. Pan Atlantic Steamship Corp., 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956). We now turn to the issues raised on appeal.[1]
 
 II. APPORTIONMENT OF FAULT
 
 11
 In an attempt to reduce their liability, Walton and Slatco[2] attack numerous findings and conclusions reached by the district court. Both contend that the district court erred in refusing to attribute fault to Reyna, Delmar and World Marine. They also attack the district court's apportionment of fault. On review, the district court's findings of fact, including its apportionment of fault, are binding unless they are clearly erroneous. Tullos v. Resource Drilling, Inc., 750 F.2d 380 (5th Cir.1985); Domar Ocean Transportation, Ltd. v. M/V ANDREW MARTIN, 754 F.2d 616 (5th Cir.1985).
 
 A. REYNA, DELMAR AND WORLD MARINE
 
 12
 Walton and Slatco argue that the district court erred in not finding the CHERAMIE BROS. 101 inadequate to contain and transport Bosnor's cargo. They assert that the district court's findings with respect to the adequacy of the barge are inconsistent; the court found that if the CHERAMIE BROS. 101 had been loaded with Bosnor's cargo in the customary fashion its stability would have been reduced because its vertical center of gravity would have been located five feet above the deck. The court also concluded that the barge would have been adequate for the voyage if the cargo had been properly secured and the ballast had not been added. Based on the first finding, Walton and Slatco insist that the deck space of the CHERAMIE BROS. 101 was too small for Bosnor's cargo to be loaded without the barge losing stability; thus, according to appellants, Reyna and Delmar should be assessed fault for supplying an inadequate barge.
 
 
 13
 We disagree that these findings are inconsistent as suggested by appellants. Although the district court found that Bosnor's cargo, loaded in a customary manner, placed the center of gravity of the barge more than five feet above the deck and reduced the stability of the barge, the court did not find that this condition contributed to the loss prior to the addition of ballast. This determination is supported by the testimony of Mr. Shumaker, a naval architect, who testified that the barge, after it was loaded and before the ballast was added, met the Coast Guard's stability requirements. The weight of the cargo was clearly within the barge's carrying capacity. Therefore, the district court's conclusion that the CHERAMIE BROS. 101 was adequate is not clearly erroneous.
 
 
 14
 Walton additionally argues that the district court erred in finding that the tug supplied by Delmar was underpowered for towing the barge as loaded but would have been adequate if the cargo had been secured properly and the ballast not added. The district court was entitled to infer from the testimony of Mr. Thyssen, a marine surveyor, that any inadequacies in the tug were not a proximate cause of the casualty.
 
 
 15
 On the other hand, we agree that some fault should be apportioned to World Marine. The district court listed as a cause of the casualty that "the barge CHERAMIE BROS. 101 was loaded so that it was down by the head and had a starboard list." World Marine was hired to determine whether the cargo was safely loaded and secured for the voyage. Its cargo loading and securing survey noted that the barge's list and trim were undesirable, but concluded that the cargo was properly loaded and secured for the intended voyage. World Marine did not recommend that the cargo be reloaded or shifted to place the barge on an even keel. In light of the district court's finding that the list and trim contributed to the loss, some fault should have been attributed to World Marine for certifying that the cargo was properly loaded and secured.
 
 
 16
 World Marine argues in the alternate that its liability is limited to the cost of the survey by a clause in its survey report.[3] However, World Marine cites no record source, and we can find none, establishing that Reyna or any of the other parties to this suit agreed to this limited liability clause. Clauses that purport to limit a party's legal responsibility are strictly construed and to be given effect must clearly express the intent of all parties whose liability is altered by the agreement. M.O.N.T. Boat Rental Services, Inc. v. Union Oil Co., 613 F.2d 576, 580 (5th Cir.1980). The fact that World Marine had dealings before the survey at issue with Reyna in which a survey report was issued with the identical limited liability clause is insufficient in this instance to support the conclusion that Reyna agreed to exonerate World Marine from liability for a negligent survey. On remand, the district court shall assess against World Marine the portion of fault it finds appropriate, consistent with this opinion.
 
 B. SLATCO AND WALTON
 
 17
 Slatco and Walton each seeks to shift a greater portion of fault to the other. Slatco urges the reversal of the district court's fact findings that: (1) the addition of ballast put the barge below its load line; (2) the barge was towed with a 600-foot towline; and (3) the breaking of several steel bands securing the cargo contributed to the loss. After reviewing the record, we are persuaded that these findings are not clearly erroneous and, therefore, may not be reversed.
 
 
 18
 The testimony established that after the CHERAMIE BROS. 101 was loaded it had a starboard list of ten to eighteen inches and the load line was several inches above the water. Delmar's expert, Mr. Schumaker, calculated that no more than 76 tons of ballast was required to correct an 18-inch list and that 76 tons of ballast would place the barge at its load line. Citing testimony that the barge was level after ballasting, Slatco argues that the district court erred in finding that 120 tons of ballast, which would place the barge below her loadline, was added.
 
 
 19
 But the tug's captain testified that he pumped four to five feet of water into the port stern compartment of the barge. Schumaker calculated the weight of this water at 121 tons. The captain also testified that after ballasting he was unable to see the load line. In addition to Mr. Schumaker, Bosnor's expert, Mr. Pazos, testified that 120 tons of ballast would sink the barge below her loadline. This testimony, coupled with the absence of eyewitness testimony that the barge was not below the loadline after ballasting, supports the district court's finding that the tug captain added excessive ballast that placed the barge below its loadline.
 
 
 20
 Likewise, the evidence supports the district court's conclusions concerning the other two findings contested by Slatco. Slatco's president testified that before this voyage Slatco bought a new 1200-foot tow line for the L.A. BARRIOS. But the district court was entitled to find more credible the tug captain's testimony that the towline was not new and was approximately 500 feet long. This was supported by testimony of the tug's mate who estimated the length of the towline at 600 feet. With respect to the steel bands, the testimony of Walton supported the district court's finding that the integrity of the cargo was compromised when the bands broke and this breakage contributed to rolling and loosening of the pipes which added to the stress on the stanchions.
 
 
 21
 Slatco also complains that the district court erroneously found the master of the tug negligent for (1) adding ballast to the barge, and (2) towing the barge for an excessive amount of time in a manner which loosened the cargo. Slatco argues that these acts were not negligent because they did not constitute "gross or flagrant" error on the master's part. The IMOAN, 67 F.2d 603 (2d Cir.1933); Valentine Waterways Corp. v. TUG CHOPTANK, 260 F.Supp. 210 (E.D.Va.1966), aff'd, 380 F.2d 381 (4th Cir.1967).
 
 
 22
 Slatco's reliance on The IMOAN, and Valentine Waterways is misplaced; these cases do not support Slatco's position that the tug captain is not considered negligent unless he commits grave or flagrant acts. Instead, they stand for the proposition that a master's acts are negligent when they exceed the bounds of his reasonable discretion. Here, the master of the L.A. BARRIOS had a duty to use "such reasonable care and maritime skill as prudent navigators employ for the performance of similar service." Stevens v. THE WHITE CITY, 285 U.S. 195, 202, 52 S.Ct. 347, 350, 76 L.Ed. 699 (1932). See also Agrico Chemical Co. v. M/V BEN MARTIN, 664 F.2d 85, 90 (5th Cir.1981). The district court's finding of negligence on the part of the captain is supported by the record and is not clearly erroneous.
 
 
 23
 Slatco submits that even without reversal of these findings it should suffer no liability for its negligent acts because the insufficient stanchions erected by Walton were the sole proximate cause of the loss. For its part, Walton complains that 60% of the fault is an unjustified burden for it to bear. The record evidences that both Slatco and Walton were guilty of fault. Slatco negligently added excess ballast to the barge and towed it in an unreasonable manner. Walton failed to adequately design and brace the stanchions and properly secure the cargo. The district court was not clearly erroneous in finding these actions by Slatco and Walton to be major contributions to the casualty, and, except for its findings with respect to World Marine, the district court did not err in apportioning the fault as it did.
 
 III. REYNA'S RECOVERY OF DAMAGES
 
 24
 Reyna contends on cross-appeal that as bareboat charterer of the CHERAMIE BROS. it is entitled to recover its expenses and lost profits associated with the casualty from Slatco and Walton. The district court did not assign reasons for denying relief to Reyna. Walton and Slatco contend that Reyna's claim is barred under the rule of Robbins Drydock and Repair Co. v. Flint, 275 U.S. 303, 48 S.Ct. 134, 72 L.Ed.2d 290 (1927).
 
 
 25
 The Robbins rule, as stated by this court sitting en banc, prohibits "recovery for economic loss absent physical injury to [property in which plaintiff holds] a proprietary interest ...." State of Louisiana ex rel Guste v. M/V TESTBANK, 752 F.2d 1019, 1023 (5th Cir.1985), cert. denied sub nom., White v. M/V TESTBANK, --- U.S. ---, 106 S.Ct. 3271, 91 L.Ed.2d 562 (1986). The question presented is whether Reyna had a sufficient proprietary interest in the CHERAMIE BROS. 101 to escape the grasp of Robbina and TESTBANK. Reyna asserts that its status as a bareboat charterer of the barge confers on it the necessary proprietary interest.
 
 
 26
 We agree. Robbins itself suggests that a bareboat charterer has a proprietary interest in the vessel chartered. "The district court allowed recovery on the ground that the respondents had a 'property right' in the vessel, although it is not argued that there was a demise ...." 275 U.S. at 309, 48 S.Ct. at 135. A bareboat charterer stands in the shoes of the owner of the vessel for the duration of the charter and is responsible for managing and maintaining the ship; the shipowner merely retains a right of reversion. Additionally, if the vessel is damaged, the charterer is ordinarily responsible to the shipowner for the damage. See Gilmore & Black, The Law of Admiralty Secs. 4-20--4-24 (2 ed. 1975). We conclude that Reyna is not barred by Robbins from asserting a claim for its damages. See also Louisville & Nashville Railroad Co. v. M/V BAYOU LACOMBE, 597 F.2d 469 (5th Cir.1979). The extent of those damages will be determined by the district court on remand.
 
 IV. FAILURE TO MITIGATE DAMAGES
 
 27
 The district court found that Bosnor's cargo went overboard forty-five miles from the Tampico harbor in 140 feet of water. The district court concluded that although Bosnor made no attempt to salvage the cargo, the chance of a successful salvage effort was so slight that Bosnor's decision was reasonable. Walton and Slatco contest this finding and urge us to reduce Bosnor's damage award for its failure to mitigate its damages.
 
 
 28
 Walton and Slatco had the burden of establishing that Bosnor's failure to salvage was unreasonable under the circumstances and aggravated the harm. Tennessee Valley Sand & Gravel Co. v. M/V DELTA, 598 F.2d 930, 933 (5th Cir.1979). They produced testimony that the seabed where the cargo was lost is ideal for a salvage effort, that finding the cargo would cost $7,500-$15,000, and that recovering it would cost $300,000-$500,000. The district court found that Walton's and Slatco's burden was not met because the estimated costs of salvage were "pure speculation" and Bosnor was justified in declining to expend this sum on such a risky venture.
 
 
 29
 "In determining whether the victim's conduct falls within the range of reasonableness, the court must consider that the necessity for decision-making was thrust upon him by the defendant ... and will allow the injured party a wide latitude in determining how best to deal with the situation." 598 F.2d at 933. Here, Bosnor's cargo was dumped into the Gulf of Mexico in 140 feet of water in an ill-defined area approximately forty-five miles from Tampico. The district court did not err in concluding that Bosnor's decision not to spend substantial sums--above the $1,400,000 it already paid for the cargo--to engage in a risky attempt to salvage the cargo was reasonable.
 
 
 30
 Walton and Slatco also argue that Gaspar v. Dow Chemical Co., 750 F.2d 460, modified, 754 F.2d 1259 (5th Cir.1985), places a duty on Bosnor to at least investigate the possibility of salvage. However, this view of Gaspar is too broad and fails to consider the palpable distinction in the facts of the two cases. In Gaspar plaintiffs' boat was struck while tied to a dock and began taking on water. Plaintiffs made no attempt to prevent the boat from sinking although it remained afloat for six days after the collision; they also refused to pay $300 to have the boat raised after it sank. We simply found that under these facts--which have little relation to the facts in the present case--that the plaintiffs' conduct in failing to mitigate their damages was unreasonable.
 
 V. RYAN DOCTRINE
 
 31
 Walton and Slatco urge that the Ryan doctrine has no application to the cross claims filed against them by Delmar and Cheramie; consequently, Walton and Slatco argue that the district court erred in permitting Delmar and Cheramie to recover their costs and attorneys' fees predicated on Ryan. Reyna, by cross-appeal, contends the district court erred in denying its claim--as bareboat charterer of the CHERAMIE BROS. 101--for indemnity from Walton and Slatco. After a careful review of our recent decisions on this issue, we agree with Walton and Slatco that indemnity is not available to Delmar, Cheramie or Reyna.
 
 
 32
 In Ryan Stevedoring Co. v. Pan Atlantic Steamship Corp., supra, a longshoreman was injured when cargo improperly stowed by the stevedore broke loose and struck him. The longshoreman was employed by the stevedore which was shielded from a tort action from its injured employee by the Longshore and Harbor Workers' Compensation Act (LHWCA). The injured longshoreman sued the shipowner for an unseaworthy vessel and prevailed on this action. The shipowner sought indemnity from the stevedore which created the unseaworthy conditions aboard the vessel. The Supreme Court held that the shipowner was entitled to indemnity from the stevedore because the stevedore had breached its warranty of workmanlike performance (WWLP) when it improperly loaded the cargo. "Competency and safety of stowage are inescapable elements of the [stevedoring] service undertaken .... It is of the essence of petitioner's stevedoring contract. It is petitioner's warranty of workmanlike service that is comparable to a manufacturer's warranty of the soundness of its manufactured product." 350 U.S. at 133, 76 S.Ct. at 237.
 
 
 33
 Ryan thusly created an implied WWLP, the breach of which entitled the vessel owner to full indemnity against the stevedore for losses suffered in an action brought by the stevedore's employee. The Supreme Court later held that the WWLP could be breached without negligence on the stevedore's behalf. Italia Societa per Azioni di Navigazione v. Oregon Stevedoring Co., 376 U.S. 315, 84 S.Ct. 748, 11 L.Ed.2d 732 (1964). The Court did afford the stevedore some protection by refusing Ryan indemnity where the shipowner's conduct or negligence was "sufficient to preclude recovery." Weyerhaeuser Steamship Co. v. Nacirema Operating Co., 355 U.S. 563, 567, 78 S.Ct. 438, 441, 2 L.Ed.2d 491 (1958). However, such negligence was narrowly construed by this Circuit to mean conduct by the shipowner "which prevents the stevedore's workmanlike performance." Brock v. Coral Drilling, Inc., 477 F.2d 211, 217 (5th Cir.1973).
 
 
 34
 The Ryan doctrine was "designed to serve special problems in maritime law arising from the absolute and nondelegable duty of seaworthiness which general maritime law imposes upon all vessel owners." Hobart v. Sohio Petroleum Co., 445 F.2d 435, 438 (5th Cir.), cert. denied sub nom., Sohio Petroleum Co. v. Oil Transport Co., 404 U.S. 942, 92 S.Ct. 288, 30 L.Ed.2d 256 (1971). Despite this limited purpose, the Ryan acorn mushroomed into a big oak, Delta Engineering Corp. v. Scott, 322 F.2d 11, 18 (5th Cir.1963), cert. denied, 377 U.S. 905, 84 S.Ct. 1164, 12 L.Ed.2d 176 (1964); the doctrine flourished for over a decade and expanded beyond the factual confines of Ryan. See Gorman, "Ryan Indemnity in Maritime Property Damage Cases: What of Proportionate Fault?" 8 U.Balt.L.Rev. 42, 47 (1978).
 
 
 35
 In 1972, Congress abrogated the Ryan doctrine's application to longshoremen, the very source from which it sprang, by an amendment to LHWCA. See 33 U.S.C.A. Sec. 905(b) (West 1986). This amendment "brought on a rash of lower court farewells to the Ryan warranty." Gorman, supra, at 54. Nonetheless, some of our cases decided both before and after the 1972 amendment, allowed Ryan indemnity in cases involving non-personal injury--a fact not present in the Ryan decision. See, e.g., F.J. Walker Ltd. v. M/V "LEMONCORE", 561 F.2d 1138 (5th Cir.1977); Dow Chemical Co. v. Barge UM-23B, 424 F.2d 307 (5th Cir.1970). Our more recent decisions, however, have restricted the application of the Ryan doctrine to its factual context.
 
 
 36
 In Gator Marine Service Towing, Inc. v. J. Ray McDermott & Co., 651 F.2d 1096 (5th Cir.1981), a tug owned by Gator Marine sank with the resulting loss of McDermott's cargo. The district court found McDermott at fault for failing to load the cargo properly and the tug's crew at fault for failing to inspect the cargo periodically; the court applied the comparative fault principles announced by United States v. Reliable Transfer Co., Inc., 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975), and apportioned the fault between the two parties. Gator Marine objected to the use of comparative fault principles; it contended that McDermott, as stevedore, had breached its WWLP and owed Ryan indemnity to Gator Marine. We rejected this claim and concluded that Gator Marine's negligence in failing to inspect the cargo was sufficient under Weyerhaeuser to preclude Ryan indemnity. As an alternate ground for denying Gator Marine's indemnity claim, we concluded that disputes over damaged or lost cargo "are best accommodated by straightforward application of the usual maritime comparative fault system." 651 F.2d at 1100.
 
 
 37
 In Agrico Chemical Co. v. M/V BEN W. MARTIN, supra, Brent loaded Agrico's cargo aboard Logicon's barge. The barge capsized and Agrico's cargo was lost. Agrico sued Logicon to recover for its lost cargo and Logicon asserted a third-party demand for indemnity against Brent. The district court found that Logicon's barge was not suitable for the movement of Agrico's cargo but held that Brent alone was liable for the loss for failure to "discontinue the loading of the barge and thereby avoid an unseaworthy condition in connection therewith." 664 F.2d at 90. Judgment was entered in favor of Agrico and against Logicon but the district court allowed Logicon recovery over against Brent under Ryan. Relying on Gator Marine, we reversed the award of Ryan indemnity on grounds that " '[p]roportional damages based on degrees of fault is now the general rule for damages in maritime property damage cases.' " 664 F.2d at 93 (citation omitted). We concluded that Logicon and Brent were equally at fault and apportioned the loss equally between them.
 
 
 38
 Delmar and Cheramie argue that these cases are distinguishable because in both the vessel owner was concurrently negligent with the stevedore, whereas here no negligence was attributed to them. But we do not read Gator Marine and Agrico so narrowly. Although we noted in both cases that the shipowner was sufficiently negligent to preclude it from obtaining Ryan indemnity, we did not restrict the application of the comparative fault principles in property damage cases to only those circumstances where the shipowner's negligence is great enough to preclude his recovery of Ryan indemnity. Delmar and Cheramie seek the benefit of both the Ryan rule and comparative fault principles without the detriments of either: they would have the Ryan rule apply to allow them full indemnity if their fault did not rise to a level that precludes their recovery; but if their fault was so egregious to preclude recovery, they would accept the application of comparative fault principles to their claims so that they could obtain a partial recovery. This is untenable; either the Ryan principle or comparative fault principles must be applied to the shipowner's claim. We are persuaded that Gator Marine and Agrico support the application of comparative fault principles in maritime property damage cases over the all or nothing approach of Ryan.
 
 
 39
 Our reading of these cases is consistent with this Circuit's trend of restricting the Ryan doctrine to the narrow fact situation in which it arose. Bass v. Phoenix Seadrill/78, Ltd., 749 F.2d 1154, 1167 (5th Cir.1985). This trend was noted with approval by the court en banc in Hercules, Inc. v. Stevens Shipping Co., Inc., 698 F.2d 726 (5th Cir.1983). In Hercules a cargo owner asserted a claim for damaged cargo against a tug; the cargo owner alleged negligent towing and breach of the tug's WWLP. The court concluded that under the facts presented, the cargo owner, if it had a claim at all, could recover under its theory of negligent towing and declined to discuss the applicability of the WWLP to the towing contract. The WWLP issue was raised because the holding in Stevens v. East-West Towing Co., Inc., 649 F.2d 1104 (5th Cir.1981), cert. denied, 454 U.S. 1145, 102 S.Ct. 1007, 71 L.Ed.2d 298 (1982), strongly suggested that a WWLP was implied in contracts of towage and would support an indemnity claim for property damage. Although we avoided the issue in Hercules, our desire to restrict Ryan is clear from our discussion of East-West: "It warrants emphasizing also that in East-West the breach of WWLP resulted in personal injuries claimed to have resulted from unseaworthiness, the very thing giving rise to the Ryan doctrine .... [T]his Circuit has reluctantly expanded the application of the Ryan doctrine." 698 F.2d at 738 n. 25.
 
 
 40
 Underlying policy considerations of uniformity and fairness also support application of comparative fault principles rather than the all or nothing approach of Ryan. We have observed that "comparative fault has long been the accepted risk-allocating principle under the maritime law, a conceptual body whose cardinal mark is uniformity." Lewis v. Timco, Inc., 716 F.2d 1425, 1428 (5th Cir.1983) (en banc). In Reliable Transfer, supra, the Supreme Court found comparative fault to be the preferred remedy in maritime collision cases. The Court concluded that comparative fault provides a greater incentive for all concerned parties to use proper "care and vigilance." 421 U.S. at 403, 95 S.Ct. at 1712.
 
 
 41
 Ryan 's imposition of complete liability on the party breaching its WWLP, on the other hand, "provides little incentive for the [shipowner] to take prophylactic steps." Smith & Kelly Co. v. S/S CONCORDIA TADJ, 718 F.2d 1022, 1029 (11th Cir. 1983). Also, as suggested above, "application of comparative fault principles is the fairest solution. Ryan-like indemnity creates great potential for injustice. Under Ryan, the indemnitor need not be at fault--breach of the warranty of workmanlike service may be non-negligent. Moreover, mere negligence committed by the indemnitee does not defeat indemnity." Id. (citations omitted).
 
 
 42
 We conclude that Ryan has no application to this case and the district court erred in granting Ryan indemnity to Delmar and Cheramie.
 
 VI. BOSNOR'S CLAIMS
 
 43
 Not content with the judgment entered in its favor, Bosnor argues that its award of prejudgment interest should be set at a rate of 15.45% rather than 11% on the basis of its evidence that the average daily prime interest rate during the relevant period was 15.45%. A district court has broad discretion in setting a prejudgment interest rate and is entitled to look to "the judgment creditor's actual cost of borrowing money or to other reasonable guideposts indicating a fair level of compensation." Gator Marine Service Towing, Inc. v. J. Ray McDermott & Co., supra, at 1101 (citations omitted).
 
 
 44
 Slatco offered evidence in a motion to amend the judgment that the average interest rate for three month treasury bills during the appropriate period was 11.125%. The evidence indicated that these rates were initially above 11% during this period but quickly fell much lower than 11%. The district court did not abuse its discretion when it set the prejudgment interest rate at 11%.
 
 
 45
 We also note that the district court inexplicably apportioned liability 25% to Slatco in personam and 15% percent to the L.A. BARRIOS in rem. However, based on the district court's findings, Slatco's liability stems from the negligence of its tug. This negligence also imposes liability in rem on the L.A. BARRIOS, which was before the court by virtue of the ad interim stipulation filed in Slatco's limitation of liability proceeding which was consolidated with this suit. 2 Benedict on Admiralty Sec. 45 (7th ed. 1986). On remand the district court shall also enter judgment jointly against Slatco and the L.A. BARRIOS.
 
 
 46
 Finally, Bosnor seeks a judgment against Insurance Company of North America (INA), Slatco's surety on the ad interim stipulation filed in Slatco's limitation proceeding. The ad interim stipulation was offered in place of Slatco's tug as satisfaction for a judgment against Slatco. The sole reason offered against entry of judgment against INA--that the L.A. BARRIOS is only liable for 15% fault and INA may wish to question whether it is responsible for the tug's liability alone or Slatco's liability also--has been dispensed with. Therefore, on remand the district court should additionally enter judgment against INA jointly with Slatco not to exceed the amount of its bond.
 
 CONCLUSION
 
 47
 In summary, the judgment of the district court in favor of Bosnor and against Walton and Slatco should be modified on remand in the following respects: (1) The district court should amend the judgment to reflect the same percentage of fault against both Slatco and its tug the L.A. BARRIOS; (2) Insurance Company of North America should be included as a judgment debtor liable jointly with Slatco and the L.A. BARRIOS, subject to the limit of its stipulated liability; (3) Some degree of fault should have been attributed to World Marine, as outlined above, and on remand the district court should determine the extent of that fault, apportion the fault among Walton, Slatco and World Marine, and enter judgment accordingly.
 
 
 48
 The denial of Reyna's claim against Walton, Slatco and World Marine is reversed; assessment of Reyna's damages shall be determined by the district court on remand. The judgment entered in favor of Delmar and Cheramie for their defense costs against Walton and Slatco is reversed. The judgment of the district court is in all other respects affirmed.
 
 
 49
 Accordingly, the judgment of the district court is
 
 
 50
 AFFIRMED in part, REVERSED in part and REMANDED for further proceedings consistent with this opinion.
 
 
 
 *
 Due to his death on March 27, 1986, Judge Albert Tate, Jr. did not participate in this decision. The case is being decided by a quorum. 28 U.S.C. Sec. 46(d)
 
 
 [1]
 FIMSA settled its claim prior to this appeal and is no longer a party to this action
 
 
 [2]
 Bosnor asserts that Slatco's appeal was not timely filed because its notice of appeal was filed more than thirty days after the district court's entry of an amended memorandum and opinion on October 1, 1984. This argument is meritless. The time limit for filing a notice of appeal runs from the filing of a final judgment on a separate instrument. Fed.R.Civ.P. 58. United States v. Indrelunas, 411 U.S. 216, 93 S.Ct. 1562, 36 L.Ed.2d 202 (1973). Here, a final amended judgment was entered on December 18, 1984, and, measured from this date, Slatco unquestionably filed a timely notice of appeal
 
 
 [3]
 The survey report states:
 The surveyor agrees to use best efforts in behalf of those for whom this survey is made, however this report is issued subject to the conditions that it is understood and agreed that neither this office nor any surveyor thereof will have any liability for any inaccuracy, errors or omissions, whether due to negligence or otherwise, in excess of the actual charge made for this survey, and that use of this report shall be construed to be an acceptance of the foregoing.