United States Court of Appeals
Fifth Circuit

**F I L E D**

**June 26, 2007**

Charles R. Fulbruge III
Clerk

**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

No. 06-30689

BUTTERFLY TRANSPORTATION
CORPORATION; SAMOS STEAMSHIP CO., S.A.,

Plaintiffs-Appellants,

versus

BERTUCCI INDUSTRIAL SERVICES LLC,

Defendant-Appellee.

Appeal from the United States District Court
for the Eastern District of Louisiana
(04-CV-3533)

Before JOLLY, STEWART, and PRADO, Circuit Judges.

PER CURIAM:[*]

Butterfly Transportation Corporation and Samos Steamship Company (hereinafter jointly

"Owners"), owners of the vessel M.V. Maya, seek damages from breach of contract pursuant to an

agreement with Bertucci Industrial Services ("Bertucci") to clean the holds of the Maya. The district

---

[*]Pursuant to 5th Cir. R. 47.5, the Court has determined that this opinion should not be published
and is not precedent except under the limited circumstances set forth in 5th Cir. R. 47.5.4.

court granted summary judgment to Bertucci, and the Owners now appeal. We reverse and remand.

I. FACTUAL AND PROCEDURAL BACKGROUND

The material facts are not in dispute. In December 2003, the Maya was chartered to deliver agricultural products, including soybeans, from Louisiana to Turkey and Syria. The crew of the Maya had been unable to fully clean the residues of prior cargos from the eight holds of the ship. Upon arrival in New Orleans, the ship's holds were initially inspected and rejected by the United States Department of Agriculture ("USDA").[1]

Captain Katsaros, an employee of Maritime Endeavors, a separate marine services company hired by the Owners to act as their agent, worked with the Owners to determine what would be necessary to clean the holds. He recommended obtaining bids for the job and advised that man-lifts might be necessary to completely clean the holds. Four companies, including Bertucci, submitted bids for the job after physically inspecting the holds of the ship. Bertucci's bid was for $145,000, an amount that Katsaros testified was unusually high in his experience. Bertucci's bid reads in relevant part: "We offer a no cure no pay price of $145,000 to obtain passes for loading for USDA and NCB [National Cargo Bureau].[2] We estimate the project will require 5 to 6 days for cleaning, but do not guarantee the number of days. This rate includes a crane barge to place the manlifts in each cargo hold as well as the gear and chemicals required during mobilization." For various reasons, all the contractors but Bertucci were eliminated.

The Owners had follow-up conversations with Katsaros and asked him to obtain additional

---

[1]One of the holds was not inspected because it was filled with sea water acting as ballast.

[2]When the NCB initially examined the holds, it approved all of them except the one filled with ballast. After the cleaning, the NCB again certified all the holds.

2

information from Bertucci, including a request for Bertucci to obtain liability insurance coverage, which Bertucci agreed to do. On January 6, 2004, the Owners sent a "Confirmation of Order" to Katsaros, who then passed it on to Bertucci. The document reads in part: "Further to our exchanged emails and telecoms overnight and this morning we hereby confirm our acceptance of Bertucci Industrial Services LLC, to carry out cleaning and preparing all ship's cargo holds (8 cargo holds) for grain loading. Work to commence immediately and to terminate with issuing NCB and USDA holds acceptance certificate for loading grains. . . ." There were additional emails exchanged between the Owners and Bertucci after this communication, but these emails do not provide any additional negotiation related to the main purpose of the contract, but instead are devoted to consideration of peripheral matters, such as what will be done with the water used to clean the holds and what kind of chemicals will be used. None of the parties mention any additional communications. All parties agree that the Confirmation of Order is the contract in this matter.

Bertucci began working the morning of January 7, 2004. The cleaning crew worked from 7 a.m. to about 5:30 p.m. The crew worked similar hours on January 8. On the evening of January 8, Bertucci informed the Owners that the Maya would be ready for inspection by the USDA the next day. On the afternoon of January 9, the USDA inspected and approved all the cargo holds.

Loading of the agricultural products began the next morning. Soybeans were placed into cargo hold 2. The loading was complete and the vessel sailed on January 11. The Maya first sailed to Turkey where a small portion of the soybeans were delivered from hold 2. No damage was noted at this time. On February 13, the ship arrived in Syria but due to weather was unable to dock until March 1. At this time, some of the soybean cargo in hold 2 was found to be water damaged. The damaged cargo was removed, and the discharge of the remaining soybeans resumed. On March 6,

3

soybeans emerged from the cargo hold covered in a sticky, black substance. A local cargo surveyor indicated that the soybean contamination was caused by oily residues remaining on the surfaces of the upper parts of hold 2. These were later determined to be prior oil cargo residues that had not been removed.

The Owners settled with the cargo receivers for $1,750,000 because the soybeans remaining in the hold were contaminated and unfit for human consumption. After the complete discharge of all cargo, the Maya's crew members again tried to clean the holds but were unsuccessful. When the Maya reached its next job, the cargo holds were again rejected because of the prior cargo residues that were noted in Louisiana prior to the loading of the agricultural products. Shore labor was again engaged for additional cleaning, and the Maya was placed off-hire during this time.

The Owners filed suit seeking to recover the damages paid to the cargo receivers as well as the outlay for the additional cleaning. The Owners asserted several causes of action, including general contract damages and damages stemming from breach of the implied warranty of workmanlike performance. Bertucci motioned for summary judgment, and the district court granted the motion, holding that Bertucci fulfilled its obligation under the contract when the USDA approved the holds for grain loading. The Owners appeal.

## II. DISCUSSION

A. Ambiguity

The Owners argue that the district court erred by finding that Bertucci fulfilled its contractual obligations by obtaining the loading permits from the USDA and the NCB. The Owners urge that this was the agreed upon termination point of the contract, not the course of performance agreed upon. The Owners also urge that the contract is ambiguous and that the

4

parties' intent should be determined by looking at the course of conduct and the amount of money paid under the contract.

The interpretation of contracts is a question of law that this court reviews de novo. *Dell Computer Corp. v. Rodriguez*, 390 F.3d 377, 384 (5th Cir. 2004). "A basic principle of contract interpretation in admiralty law is to interpret, to the extent possible, all the terms in a contract without rendering any of them meaningless or superfluous." *Chembulk Trading LLC v. Chemex Ltd.*, 393 F.3d 550, 555 (5th Cir. 2004) (citing *Foster Wheeler Energy Corp. v. An Ning Jiang MV*, 383 F.3d 349, 354 (5th Cir. 2004)). The determination of whether a contract is ambiguous is also a question of law. *Hidden Oaks Ltd. v. City of Austin*, 138 F.3d 1036, 1048 (5th Cir. 1998). A contract is unambiguous if "its language as a whole is clear, explicit, and leads to no absurd consequences, and as such it can be given only one reasonable interpretation." *Chembulk Trading*, 393 F.3d at 555 n.6. Once a contract is found to be ambiguous, the determination of the parties' intent through extrinsic evidence is a question of fact, and deference is due the determination of the district court. *Hidden Oaks*, 138 F.3d at 1048.

The district court failed to give meaning to the following clause of the agreement: "we [The Owners] hereby confirm our acceptance of [Bertucci] to carry out cleaning and preparing all ship's cargo holds (8 holds) for grain loading." While the language of the contract doesn't necessarily support the Owners's contention that Bertucci agreed to "remove the residue of prior cargoes so that there would be no contamination of the cargo to be loaded at New Orleans," this phrase could be interpreted to require more than Bertucci's obtaining a loading pass from the USDA.

Therefore, the contract is ambiguous. It is unclear exactly what is entailed in "cleaning and preparing all ship's cargo holds . . . for grain loading." There are multiple reasonable interpretations

5

of this phrase. Because the contract is ambiguous, materials, testimony, and evidence outside the contract itself may be consulted to determine the contract's meaning. *Corbitt v. Diamond M. Drilling Co.*, 654 F.2d 329, 332-33 (5th Cir. Aug. 1981). "[I]f a contract is ambiguous, a fact issue remains regarding the parties' intent," rendering summary judgment inappropriate. *Instone Travel Tech Marine & Offshore v. Int'l Shipping Partners, Inc.*, 334 F.3d 423, 431 (5th Cir. 2003) (*citing In re El Paso Refinery, LP*, 302 F.3d 343, 352 (5th Cir. 2002)); *see also Gonzalez v. Denning*, 394 F.3d 388, 392 (5th Cir. 2004) ("In the context of contract interpretation, only when there is a choice of reasonable interpretations of the contract is there a material fact issue concerning the parties' intent that would preclude summary judgment.") (internal citations omitted). Therefore, we remand the case for further proceedings to determine the parties' intent.

B. Warranty of Workmanlike Performance

The Owners also complain that the district court completely ignored their claim that Bertucci breached its warranty of workmanlike performance ("WWLP"). The Owners argue that the district court erred in granting summary judgment on this claim because there are contested matters of fact surrounding whether Bertucci's performance breached this warranty.

Bertucci argues that the warranty of workmanlike performance was abrogated by the 1972 amendments to the Longshore and Harbor Workers' Compensation Act. Bertucci argues that even to the extent that this warranty exists, this argument is an attempt by the Owners to hold Bertucci liable for duties that were not part of the parties' agreement.

The existence and effect of WWLP in admiralty contracts is a legal issue that this court reviews de novo. *See In re ADM/Growmark River Sys., Inc.*, 234 F.3d 881, 886 (5th Cir. 2000). Under the *Ryan* doctrine, "shore-based contractors who go aboard a vessel by the owner's

6

arrangement or by his consent to perform service for the ship's benefit impliedly warrant to the shipowner that they will accomplish their task in a workmanlike manner." *Parfait v. Jahncke Serv., Inc.*, 484 F.2d 296, 301 (5th Cir. 1973). "'[The] petitioner's warranty of workmanlike service . . . is comparable to a manufacturer's warranty of the soundness of its manufactured product.'" *Bosnor, S.A. de C.V. v. Tug L.A. Barrios*, 796 F.2d 776, 784 (5th Cir. 1986) (quoting *Ryan Stevedoring Co. v. Pan Atlantic S.S. Corp.*, 350 U.S. 124, 133-34 (1956)). Although the doctrine initially applied only to personal injury cases, later cases allowed vessel owners to recover full indemnity from contractors for losses in non-personal injury cases as well, even where the ship owner was partially at fault or contributorily negligent. *Id.*

In 1972, Congress amended the Longshore and Harbor Workers' Compensation Act ("LHWCA") to abrogate the *Ryan* doctrine as it applied to those covered by the Act. *Parfait*, 484 F.2d at 302 n.4. These amendments do not apply to workers not covered by the LHWCA's provisions. *See Stevens v. East-West Towing Co.*, 649 F.2d 1104, 1109 n.7 (5th Cir. Unit A July 1981). Nonetheless, based on these amendments, the Fifth Circuit began a gradual narrowing of the *Ryan* doctrine as it applied to property damage cases that were not covered directly by the LHWCA amendments. *See Bosnor*, 796 F.2d at 785-86. Accordingly, while a WWLP still exists for cases involving damage to cargo, it is now judged by comparative fault principles. *Rockwell Int'l Corp. v. M/V Incotrans Spirit*, 998 F.2d 316, 319 (5th Cir. 1993); *Bosnor*, 796 F.2d at 785-86.

The district court legally erred in not considering whether Bertucci breached its WWLP. This kind of liability exists under current Fifth Circuit law, although liability is no longer judged by the strict liability principles of *Ryan*; instead, fault must be apportioned comparatively. Because the district court did not consider or address this claim at all, we remand this case for the district court

7

to consider the WWLP claim in the first instance.

## III. CONCLUSION

We reverse the district court's grant of summary judgment and remand this case for further proceedings.